# Department of Transportation *v.* P.U.C. and The Pittsburg & Shawmut Railroad Company.

Argued September 8, 1971, before President Judge BOWMAN and Judges CRUMLISH, JR., KRAMER, WILKINSON, JR., MANDERINO, MENCER and ROGERS.

*William E. Bethards,* Assistant Attorney General, with him *Robert W. Cunliffe,* Deputy Attorney General, and *J. Shane Creamer,* Attorney General, for appellant.

*Alan R. Squires,* Assistant Counsel, with him *Edward Munce,* Acting Counsel and *Thomas C. Dick,* Assistant Counsel, for appellee, P.U.C.

*Matthew A. Crawford,* with him *Thomas D. Stauffer,* for intervening appellee, The Pittsburg & Shawmut Railroad Company.

OPINION BY JUDGE KRAMER, November 5, 1971:

This is an appeal from an Order of the Pennsylvania Public Utility Commission (PUC) dated September 7, 1970, and a denial (February 10, 1971) of a motion for modification of said order, in which it was generally ordered, *inter alia,* (1) that the Pennsylvania Department of Transportation (PENNDOT) post and maintain on each approach to the crossing a 12-ton limit sign; (2) that PENNDOT make repairs as may be necessary to make the existing bridge safe for a 12-ton limit; (3) that PENNDOT, at its initial cost and expense, conduct an engineering study and investiga-

tion of the existing bridge and its highway approaches, and prepare and submit a preliminary design, plan and estimate for a new bridge to replace the present structure; (4) that there be scheduled further hearings to consider the plans and estimates to be submitted and for the allocation of the investigation, preparation, construction and maintenance costs; and (5) that 20 per cent of the cost of making the necessary repairs and replacements to insure the bridge's 12-ton limit capacity be reimbursed to PENNDOT by the Pittsburg & Shawmut Railroad Company (Railroad).

This matter had its beginning during 1968, when, as a result of a bridge tragedy in West Virginia, the PUC, in accordance with its statutory authority, at Investigation Docket No. 97, instituted an investigation into the safety of all bridges over and under railroad tracks in the Commonwealth. As a result of this general investigation, on May 4, 1970, the PUC initiated a specific investigation concerning the bridge in question, which is located in Mahoning Township, Armstrong County, and which carries traffic on Routes Nos. 66 and 28, over the one set of railroad tracks of the Railroad.

The bridge is a reinforced concrete structure which the Railroad was ordered to build in 1919 by an order of the PUC. The construction of the bridge was completed in 1922. The record clearly shows that, from the beginning, the Railroad was ordered by the PUC to maintain the bridge and PENNDOT (formerly known as the Department of Highways) was ordered to maintain the approaches to the bridge.

As part of the procedure adopted by the PUC in this case, all interested parties, including the county and township wherein the bridge is located, were directed to answer certain interrogatories set forth in the May 4, 1970 Order. In view of the fact that the main

point of contention raised by PENNDOT is its claim that it should not be held to provide repairs or construction to correct "past due or deferred maintenance", *vis-a-vis* current maintenance, we point out PENNDOT's answer to the following PUC interrogatory:

"Interrogatory No. (a). 'Does the prevention of accidents and promotion of the safety of the public require changes in the type, location, reconstruction, maintenance, or abolition of the existing crossing, above grade, and the highway approaches thereto?' "

PENNDOT's answer to that interrogatory reads:

"The prevention of accidents and promotion of the public safety does not require changes in the type, location, reconstruction, maintenance, or abolition of the existing crossing, above grade and the highway approaches thereto. There is some concrete deterioration at several areas on the bridge, but said deterioration has not reached the point where the safety of the public is endangered."

It is interesting to note the answer of the Railroad to this same interrogatory for comparison purposes:

"The prevention of accidents and promotion of the safety of the public does require maintenance and partial reconstruction of the bridge. Safety of the public would also be promoted by change in the type and location of the bridge and highway approaches."

The record indicates generally that the Railroad made, at least, yearly inspections of the bridge; and that specifically, in 1960, after such an inspection the surface of the bridge was "black-topped". In 1961, the balustrade was "reconstructed" and in "October and November of 1968 we removed the old and deteriorated well guards and replaced them with bituminous curbing." Although all of the maintenance records of the Railroad could have been made available to PENNDOT and the PUC, at the hearing held in this matter PENN-

DOT did not present any evidence on the subject of deferred maintenance. The Railroad presented evidence that it would cost between eighty thousand and one hundred thousand dollars to make the necessary rehabilitation and construction to carry out the intent (safety) of the PUC investigation; but the record fails to support PENNDOT's proffered inference that the estimated construction cost is due solely to deferred maintenance. We believe the record prevents a conclusion that the existing construction requirements to meet the safety provisions ordered by the PUC are caused by deferred maintenance.

The Act of May 28, 1937, P. L. 1053, Section 409, as amended, 66 P.S. 1179, vests exclusive power in the PUC to determine and prescribe the alteration, relocation and maintenance of an existing bridge in the following language:

"(b) The commission is hereby vested with exclusive power to appropriate property for any such crossing, and to determine and prescribe, by regulation or order, the points at which, and the manner in which, such crossings may be constructed, altered, relocated or abolished, and the manner and conditions in or under which such crossing shall be maintained, operated, and protected to effectuate the prevention of accidents and the promotion of the safety of the public.

"(c) Upon its own motion or upon complaint, the commission shall have exclusive power after hearing, upon notice to all parties in interest, including the owners of adjacent property, to order any such crossing heretofore or hereafter constructed to be relocated or altered, or to be abolished upon such reasonable terms and conditions as shall be prescribed by the commission. In determining the plans and specifications for any such crossing, the commission may lay out, establish, and open such new highways as, in its opinion,

may be necessary to connect such crossing with any existing highway, or make such crossing more available to public use; and may abandon or vacate such highways or portions of highways as, in the opinion of the commission, may be rendered unnecessary for public use by the construction, relocation, or abandonment of any such crossings. The commission may order the work of construction, relocation, alteration, protection, or abolition of any crossing aforesaid to be performed in whole or in part by any public utility or municipal corporation concerned or by the Commonwealth."

It is clear to us that the PUC has exclusive authority to initiate the investigation it did in this matter, to hold hearings, and to make determinations on the allocation of the costs involved in providing for the safety of the public using bridges such as the one in this case.

Section 1112 of the Public Utility Law, *supra,* 66 P.S. 1442, provides:

"Effect of commission action—Whenever the commission shall make any rule, regulation, finding, determination or order under the provisions of this act, the same shall be prima facie evidence of the facts found, and shall remain conclusive upon all parties affected thereby, unless set aside, annulled, or modified in any appeal to the Superior Court taken as provided in this act."

Section 1107 of the Public Utility Law, *supra,* 66 P.S. 1437, provides in part:

". . . The order of the commission shall not be vacated or set aside, either in whole or in part, except for error of law or lack of evidence to support the finding, determination, or order of the commission, or violation of constitutional rights."

Under the Appellate Court Jurisdiction Act, Act of July 31, 1970, P. L.    (Act No. 223, art. IV, §403(1), 17 P.S. 211.403(1), jurisdiction over appeals from the

adjudications of the PUC are now vested in the Commonwealth Court. The law is quite clear as to the scope of review of this Court in disposing of appeals from adjudications of the Pa. PUC. In the case of *Clemmer v. Pa. PUC*, 207 Pa. Superior Ct. 388, 393-94, 217 A. 2d 800, 804 (1966), the Court defined its appellate jurisdiction in this area in the following terms:

"The authority of this Court to overrule an order of the Commission is limited. We may not disturb such an order except for errors of law, lack of evidence to support a finding, determination or order of the Commission, or violation of constitutional rights, Section 1107 of the Public Utility Law [Act of May 28, 1937, P. L. 1053 as amended], 66 P.S. Section 1437, Pa. Railroad Company v. Pa. PUC, 202 Pa. Superior Ct. 114, 195 A. 2d 162 (1963)."

This Court as successor to the jurisdiction previously exercised by the Superior Court in this appellate area has chosen to view similarly its scope of review. *See McNaughton Bros., Inc. v. Pa. PUC*, 2 Pa. Commonwealth Ct. 319, 278 A. 2d 186 (1971); also, *Pa. PUC v. Department of Transportation*, 2 Pa. Commonwealth Ct. 114, 276 A. 2d 573 (1971) and *Erie Lackawanna Ry. v. Pa. PUC*, 2 Pa. Commonwealth Ct. 396, 278 A. 2d 188 (1971).

Whether or not this Court may agree with the philosophy or the results, so long as the PUC had before it sufficient evidence to support its adjudication, this Court should not reverse the order of the PUC. *See People's Cab Co. v. Pa. PUC*, 216 Pa. Superior Ct. 18, 260 A. 2d 490 (1969) and *Modern Transfer Co. v. Pa. PUC*, 182 Pa. Superior Ct. 110, 125 A. 2d 463 (1956).

The record in this case exposes an unexplained attitude on the part of PENNDOT amounting to an uncooperative approach to the purposes of the PUC in the investigation of this bridge to determine its con-

dition to the end of providing for safety in the public interest. Although PENNDOT has the personnel and equipment and is responsible generally for the determination of the weight capacity of Commonwealth bridges, and for the posting of signs in connection therewith, PENNDOT witnesses stated that no PENNDOT employee was assigned the task of inspecting this bridge to determine its safety conditions, other than one "cursory" inspection. At the PUC hearings, the PENNDOT witness consistently contended that PENNDOT is not responsible for deferred maintenance. We agree with that contention. The record discloses a lack of cooperation by PENNDOT with the PUC by its failure to give an opinion on the safety questions put to its witness. PENNDOT was given its day in court to submit any evidence it desired, to prove that any unsafe condition of this bridge was due to deferred maintenance. This it failed to do.

Although there is nothing in the record from which this Court can determine whether the 12-ton limit prescribed by the PUC Order is proper under the circumstances, there is sufficient technical data from which the PUC, drawing upon its own expertise, could make such a *preliminary* determination. It can be assumed that from the engineering study ordered and now in progress, PENNDOT will advise the PUC whether the 12-ton limit figure is appropriate or unreasonably low or high.

In effect, the PUC Order of May 4, 1970, is a preliminary one and calls for further hearings after the preparation of the engineering reports by PENNDOT. At that future hearing, PENNDOT will be permitted to present any evidence or argument it desires on why an 80-20 allocation percentage ratio is fair or unfair for the future. In any event, there is sufficient evidence in the present state of the record to permit us to

affirm the Order of the PUC in allocating on the 80-20 percentage ratio as it pertains to the cost involved in providing for safe condition of the existing structure under the 12-ton limitation, from the date of that order to the date of the final order in this matter.

The Commonwealth and all of its agencies, departments and subdivisions, owe a duty to its citizens and to all who travel its highways to take all necessary and reasonable precautions to assure safe passage over its bridges. In its attempt to prevent in this State the occurrence of a bridge tragedy similar to that suffered in West Virgina, the PUC has properly inaugurated these proceedings. We hold that there is sufficient evidence in the record to support its adjudication. We can find no abuse of discretion and therefore we affirm the PUC Order dated May 5, 1970 and dismiss the appeal of PENNDOT.

---

CONCURRING AND DISSENTING OPINION BY JUDGE MANDERINO:

I concur in the majority opinion except as to the allocation of costs for the same reasons explained in my dissenting opinions in *Pennsylvania Public Utility Commission v. Department of Transportation*, 2 Pa. Commonwealth Ct. 144, 276 A. 2d 573 (1971); *Erie Lackawanna Railway Company v. Pennsylvania Public Utility Commission*, 2 Pa. Commonwealth Ct. 396, 278 A. 2d 188 (1971). There are no standards in the record by which this court can properly review the fairness of the allocation of cost.

---

DISSENTING OPINION BY PRESIDENT JUDGE BOWMAN:

The majority bottoms its position upon a lack of cooperation on the part of PENNDOT in the bridge

investigation in question and upon the failure of PENN-DOT to come forward with evidence that the existing condition of bridge structure is due to past maintenance deficiencies.

While cooperation by and between governmental agencies to the ultimate benefit of the public is certainly to be desired and encouraged, it cannot and should not be postured as a legal duty from which flows responsibilities on the part of PENNDOT not otherwise imposed by statutory law or sound principles of administrative law. Nor, in my opinion, is there any duty on the part of PENNDOT in this case to come forward with evidence or carry the burden of proving that the existing condition of the bridge structure is the fault of past maintenance.

The majority says that "the record prevents a conclusion that the existing construction requirements to meet the safety provisions ordered by the PUC are caused by deferred maintenance." This may be so, but it is equally clear that the record prevents a conclusion that the burdens placed upon PENNDOT by the PUC order appealed from are *not,* at least in part, caused by deferred maintenance. Having found the present condition of the bridge structure to be unsafe, there is no question that the PUC has the power to order such steps to be taken as necessary to protect the public against this danger. Nor is there any question that the PUC could direct PENNDOT, a party to the proceedings, to assume this responsibility. Where the PUC erred—and the majority of this Court sanctions—was in directing PENNDOT to also assume 80% of the financial burden on a record with insufficient evidence as to the cause, in whole or in part, of the present hazardous condition.

The majority also suggests that the PUC order in question is but a preliminary order and that the final

order of the PUC *may* adjust this financial burden placed on PENNDOT depending upon further proof. I do not so view the PUC order. While a further order of the PUC will follow with respect to permanent improvements found to be needed, there is no reservation or condition in the order in question which suggests or infers that the PUC will so act. If it does it will be because it recognizes that its present order is erroneous not because it retained the right to do so or because the present order is anything less than final as to costs covered by it.

Judge CRUMLISH joins in this dissent.