Pennsylvania Power & Light Company, Appellant, *v.* Pennsylvania Public Utility Commission, Appellee, and The Secretary of Defense of the United States, Intervening Appellee.

Argued June 4, 1973, before President Judge Bow-MAN and Judges CRUMLISH, JR., KRAMER, WILKINSON, JR., MENCER, ROGERS and BLATT.

*Robert H. Young,* with him *Allen W. Stewart, Vincent Butler,* and, of counsel, *Morgan, Lewis & Bockius,* for appellant.

*Philip P. Kalodner,* Counsel, with him *Daniel F. Joella,* Assistant Counsel, and *Dominic J. Ferraro,* Assistant Counsel, for appellee.

*Dellon E. Coker,* with him *Curtis L. Wagner, Jr.,* and *S. John Cottone,* U. S. Attorney, for intervening appellee.

OPINION BY JUDGE KRAMER, October 12, 1973:

This is an appeal filed by the Pennsylvania Power & Light Company (PP&L) from an order, dated March 28, 1972, of the Pennsylvania Public Utility Commission (PUC). On March 14, 1973, this Court filed an Opinion and Order disposing of the parties' cross motions (*see* 8 Pa. Commonwealth Ct. 322, 301 A. 2d 380 (1973)), and the matter is now before this Court on the merits.

The matter was initially commenced on March 15, 1971 by PP&L's filing for increased rates. In its rate filing, PP&L sought to increase the rates for electric service to its customers in the amount of $42,400,341 (approximately a 15.2 percent increase based upon the

level of operations at December 31, 1970). In its order the Commission, in effect, disallowed $12,850,000 of the proposed rate increase. Out of the many issues presented, argued and decided by the PUC, based upon volumes of testimony and statistical exhibits, the only issue presented to this Court by PP&L is whether the PUC properly determined an item of expense known as "annual depreciation." The PUC determined that a deficiency existed in PP&L's accrued depreciation as shown on its books, as the result of the adoption of a reserve requirement study of the actual depreciation for the test period. PP&L contends it was error for the PUC to disallow an increment (in addition to the annual depreciation expense) alleged to be required to amortize the deficiency so found. It argues that the increment is needed to permit the utility to recover the original cost of its investment in plant over the remaining life of that plant, as indicated by the reserve requirement study.

This Court's scope of review is limited both by statute and prior case law. Section 1107 of the Public Utility Law, Act of May 28, 1937, P. L. 1053, as amended, 66 P.S. §1437, provides in pertinent part: "The order of the commission shall not be vacated or set aside, either in whole or in part, except for error of law or lack of evidence to support the finding, determination, or order of the commission, or a violation of constitutional rights. . . ."

Under the Appellate Court Jurisdiction Act, Act of July 31, 1970, P. L. 673, §403, as amended, 17 P.S. §211.403(1), jurisdiction for appeals from the adjudications of the PUC are now vested in this Court.

In *Clemmer v. Pennsylvania Public Utility Commission*, 207 Pa. Superior Ct. 388, 393-94, 217 A. 2d 800, 804 (1966), the court described its appellate review in this area in the following terms: "The authority of this

Court to overrule an order of the Commission is limited. We may not disturb such an order except for errors of law, lack of evidence to support a finding, determination or order of the Commission, or violation of constitutional rights, . . . Pennsylvania Railroad Company v. Pennsylvania Public Utility Commission, 202 Pa. Superior Ct. 114, 195 A. 2d 162 (1963). . . ." This Court stated in the case of *Department of Transportation v. P.U.C.*, 3 Pa. Commonwealth Ct. 405, 411, 283 A. 2d 313, 317 (1971), that:

"This Court as the successor to the jurisdiction previously exercised by the Superior Court in this appellate area has chosen to view similarly its scope of review.

. . . .

"Whether or not this Court may agree with the philosophy or the results, so long as the PUC had before it sufficient evidence to support its adjudication, this Court should not reverse the order of the PUC. See People's Cab Co. v. Pa. PUC, 216 Pa. Superior Ct. 18, 260 A. 2d 490 (1969) and Modern Transfer Co. v. Pa. PUC, 182 Pa. Superior Ct. 110, 125 A. 2d 463 (1956)."[1]

Initially, in an attempt to simplify the inherently complex aspects of such a utility rate case, we will define the term "depreciation." Thereafter, we will delineate the established principles under which annual

---

[1] For other statements by this Court concerning our scope of review, see *Johnstown-Pittsburgh Express, Inc. v. Public Utility Commission*, 5 Pa. Commonwealth Ct. 521, 291 A. 2d 545 (1972); *Springettsbury v. P.U.C.*, 5 Pa. Commonwealth Ct. 102, 289 A. 2d 762 (1972); *Tranter v. P.U.C.*, 4 Pa. Commonwealth Ct. 585, 288 A. 2d 837 (1972); *McNaughton Bros., Inc. v. Pennsylvania Public Utility Commission*, 2 Pa. Commonwealth Ct. 319, 278 A. 2d 186 (1971) and *Erie Lackawanna Railroad Company v. Pennsylvania Public Utility Commission*, 2 Pa. Commonwealth Ct. 396, 278 A. 2d 188 (1971).

depreciation allowance is to be determined by the PUC under existing law.

The term "depreciation" is defined by the Commission's published Uniform System of Accounts, which all electric utilities in the State are directed and obligated to follow. It reads: " 'Depreciation', as applied to depreciable electric plant, means the loss in service value not restored by current maintenance, incurred in connection with the consumption or prospective retirement of electric plant in the course of service from causes which are known to be in current operation and against which the utility is not protected by insurance. Among the causes to be given consideration are wear and tear, decay, action of the elements, inadequacy, obsolescence, changes in the art, changes in demand and requirements of public authorities." In lay terms, the Uniform System of Accounts recognizes that all properties used in the utility's operations wear out or become less useful. Property, owned by a utility, is depreciated from the very first instant it is put into use; depreciation continues until the property becomes useless and is taken off the books of the company as a regular accounting practice. This process of wearing out or losing service value is called depreciation. In reality, there are two kinds of depreciation. One is physical depreciation caused by wear, tear, rust, rot or decay occurring with the passage of time. The second can be termed functional depreciation. It includes obsolescence, inadequacy, changes in the art, or governmental requirements, e.g., environmental control or fire regulations. President Judge RHODES of the Pennsylvania Superior Court, in *Pittsburgh v. Pennsylvania Public Utility Commission*, 178 Pa. Superior Ct. 46, 54, 112 A. 2d 826, 829 (1955), clearly defined the term. He stated: "It is generally recognized that depreciation is the loss not restored by current maintenance which is due to all the factors

causing the ultimate retirement of a utility's property. These factors embrace wear and tear, decay, inadequacy, and obsolescence. Lindheimer v. Illinois Bell Telephone Company, 292 U.S. 151. . . ."

It is well settled that a privately owned public utility is entitled to recover the original cost of its investment in depreciable plant from its customers. *See Penn Sheraton Hotel v. Pennsylvania Public Utility Commission*, 198 Pa. Superior Ct. 618, 184 A. 2d 324 (1962); *Scranton Steam Heat Company v. Pennsylvania Public Utility Commission*, 194 Pa. Superior Ct. 143, 167 A. 2d 693 (1960).

At the time a piece of depreciable plant is put into service, the management of a public utility determines its service life. As an accounting practice, they attempt to establish an amount of money to be booked in the utility's records each year as annual depreciation, with the intent to recover 100 percent of its investment over the life of the property. The public utilities in this Commonwealth have used many different methods of depreciation accounting. At various times, some used the straight line method; whereby if the piece of property had a ten-year life, ten percent of its investment cost was booked each year. Others used such unrelated methods as a percentage of revenue. It is a generally accepted maxim that it would be a very rare coincidence indeed, if the accrued depreciation at any given point in time during the life of a piece of property would be equal to the actual depreciation of that property.

Although accrued depreciation and annual depreciation are used in a rate case for two different purposes, there is an interrelationship which cannot be ignored. Accrued depreciation is an estimated figure deducted from the determined value of the utility's property used and useful in rendering its public services. (It is util-

ized unadjusted when applied to original cost rate base figures, and adjusted when applied to a "fair value" rate base.) This is a vitally important aspect to a public utility's rate case when one realizes that a public utility earns its return on its net rate base. A public utility is not supposed to earn anything on its expenses; but it is entitled to recover all its expenses. Annual depreciation is an expense item and is intended to permit the public utility to recover 100 percent of its investment in property devoted to its public service, no more and no less.

When one realizes that a public utility such as PP&L has literally thousands of different kinds of depreciable property, one can understand the complex nature of the issue presented to the PUC in its task of arriving at the proper dollar figure for both accrued depreciation and annual depreciation. It should be noted here and emphasized *that there is nothing in the law nor in any regulation of the PUC which requires any utility to record on its books the same annual depreciation which the PUC concludes is appropriate and reasonable in a rate case.* There are times when the revenues of a public utility in a given year are not sufficient to pay other operating expenses, or even dividends; and annual depreciation monies, which ordinarily and properly would have been accounted for in accrued depreciation accounts, have been used for other purposes. It has occurred (and the record in this case so indicates) that PP&L, like other utilities, on occasion has taken monies from its surplus earnings account and applied those dollar figures to its accrued depreciation records. As a result of these irregularities found in the methods used in arriving at the accrued depreciation statistics, as shown on company's records, the PUC has refused in most cases, with court approval, to accept book reserves as the sole basis for the deter-

mination of a public utility's actual depreciation for the test period involved in a rate case.

Therefore, it became the practice, in determining the value of the utility's property, that an independent study be made of the actual accrued depreciation for the test period. There are about as many different approaches to such a study as there are engineers and accountants to prepare them. In the main, however, the PUC adopted the practice of utilizing a study known as a "reserve requirement study," which is an analysis made by or for a public utility of its recent experience in retiring units of property from service for any of the causes previously described herein in the definition of "depreciation." The purpose of a reserve requirement study is to disclose the consumption of depreciable property to the date of (or through) the test period. *See Pittsburgh v. Pennsylvania Public Utility Commission,* 178 Pa. Superior Ct. 46, 112 A. 2d 826 (1955). As more complete data on plant retirements becomes available, with the passage of time, due to the more detailed plant accounting requirements of the PUC, a utility is able to make better estimates of future property service lives. These estimates are of greater significance than the past estimates which were used as the basis for the accumulation of the book reserve for depreciation. Through a rather involved procedure of plotting the gleaned data from a plant retirement study (encompassing many informed judgments as to past, present and future events) and fitting survivor curves to this material (the details of which are not pertinent here), a public utility is able to determine, within a reasonable degree, the estimated percent of accrued depreciation as of a given date. The product of this accrued depreciation percentage multiplied by the original cost of depreciable property represents the number of dollars of estimated accrued depreciation and is called "reserve requirement."

A "deficiency" in the book reserve for depreciation means only that the total amount recorded on the books in the reserve for depreciation account is less than the amount which is indicated by a reserve requirement study, the latter being the amount of depreciation which later studies indicate have occurred. When the converse situation exists, viz., the book reserve for depreciation exceeds the requirement; the difference between the two figures is called an "excess" in the book reserve depreciation. The significance of a deficiency is that the past amounts periodically credited to the reserve for depreciation on the books of the company have not been as large as the amounts which more refined and more recent studies indicate should have been recorded.

In this case the reserve requirement study ordered by the PUC disclosed that there was a deficiency in the book reserves. As a result of this finding or determination by the PUC, PP&L contends in this appeal that under the "remainder life theory" the allowance for annual depreciation (an expense item) should be increased so as to permit the amortization of that deficiency over the remaining life of the property as shown by the reserve requirement study. PP&L contends that the disallowance of such increased annual depreciation allowance unconstitutionally confiscates its property, under PP&L's reasoning that the annual depreciation allowed in the PUC order will not permit it to recover all of the dollars of its original cost investment in depreciable plant.

Before arriving at our conclusion, we believe it pertinent to set forth at this place several well established principles of law which govern our conclusion:

1. The utility is entitled under the law to recover from its customers the original cost investment in its depreciable plant. *See Penn Sheraton Hotel v. Pennsylvania Public Utility Commission, supra.*

2. A public utility will not be permitted to recover by annual allowance for depreciation a total amount in excess of the original cost investment. *See Pittsburgh v. Pennsylvania Public Utility Commission,* 187 Pa. Superior Ct. 341, 144 A. 2d 648 (1958); *Equitable Gas Company v. Pennsylvania Public Utility Commission,* 160 Pa. Superior Ct. 458, 51 A. 2d 497 (1947).

3. In determining both accrued and annual depreciation, the PUC attempts to approximate as closely and reasonably as possible the actual accrued depreciation for a test period. *See Pittsburgh v. Pennsylvania Public Utility Commission,* 187 Pa. Superior Ct. 341, 144 A. 2d 648 (1958).

4. Accrued depreciation properly should determine the consumption of property through the test period. *See Penn Sheraton Hotel v. Pennsylvania Public Utility Commission, supra; Pittsburgh v. Pennsylvania Public Utility Commission,* 178 Pa. Superior Ct. 46, 112 A. 2d 826 (1955).

5. Is it not proper for a public utility to recover, by way of annual depreciation, deficiencies in accrued depreciation not yet experienced. A utility is not permitted to pad its estimates of annual depreciation so as to meet unknown contingencies, or to compensate for possible future errors in judgment. *See Penn Sheraton Hotel v. Pennsylvania Public Utility Commission, supra.*

6. If a public utility replaces property after removal and incurs actual negative salvage in doing so, or if it experiences a genuine deficiency in its book reserve at the time the property is retired from service, then it would be appropriate to permit the public utility to amortize such deficiency over a reasonable length of time. *See Penn Sheraton Hotel v. Pennsylvania Public Utility Commission, supra.*

7. The relative weight to be given any particular evidence on depreciation is, under ordinary circum-

stances, for the Commission. The relative weight to be accorded book reserve and reserve requirement studies should be for the Commission as the trier of the facts. *See Penn Sheraton Hotel v. Pennsylvania Public Utility Commission, supra; Pittsburgh v. Pennsylvania Public Utility Commission,* 178 Pa. Superior Ct. 46, 112 A. 2d 826 (1955).

8. The book reserve set forth on the public utility's books is not binding upon the Commission. *See Penn Sheraton Hotel v. Pennsylvania Public Utility Commission, supra; Pittsburgh v. Pennsylvania Public Utility Commission,* 182 Pa. Superior Ct. 551, 128 A. 2d 372 (1956).

9. Although the PUC may be guided by its finding of accrued and annual depreciation in a prior case or cases, in determining such items in a rate case currently before it, such prior findings are not res judicata. *See Duquesne Light Company v. Pennsylvania Public Utility Commission,* 176 Pa. Superior Ct. 568, 107 A. 2d 745 (1954).

10. Where there is an excess or deficiency in the book reserve as disclosed by the reserve requirement study, the burden of proof is on the consumers or public utility, respectively, to establish that such excess or deficiency is "genuine"; i.e., (a) where there is an *excess,* that the rate payers have contributed to the capital investment of the utility's rate base through excessive payments of annual depreciation over the period when the excess was developed, or (b) where a *deficiency,* that the public utility has not received revenues sufficient to pay all of its operating expenses together with a fair return on its rate base during the years when the deficiency was created. *See Pittsburgh v. Pennsylvania Public Utility Commission,* 178 Pa. Superior Ct. 46, 112 A. 2d 826 (1955).

11. In a rate case, both annual depreciation expense allowance and accrued depreciation should be

calculated on a reasonably consistent basis. *See Pittsburgh v. Pennsylvania Public Utility Commission,* 208 Pa. Superior Ct. 260, 222 A. 2d 395 (1966) ; *Philadelphia v. Pennsylvania Public Utility Commission,* 174 Pa. Superior Ct. 641, 102 A. 2d 428 (1954).

12. Depreciation is defined as the expense occasioned by the using up of physical property. An annual depreciation allowance in rate making is an expense item designed to permit the utility to recover, over the estimated service life, the original cost of the property devoted to the public service. *See Lindheimer v. Illinois Bell Telephone Co.,* 292 U.S. 151 (1934) ; *Penn Sheraton Hotel v. Pennsylvania Public Utility Commission, supra.* (See discussion, supra.)

13. Where a public utility alleges confiscation of its property by virtue of a disallowance of sufficient annual depreciation, the burden of proof is on the utility. *See Lindheimer v. Illinois Bell Telephone Co., supra.*

14. A reserve requirement study is an analysis of the utility's recent experience in retiring from service its unit of property for various causes. It is based on present day knowledge and judgment concerning lives of property. It should disclose as accurately as possible the consumption of property to date. *See Pittsburgh v. Pennsylvania Public Utility Commission,* 178 Pa. Superior Ct. 46, 112 A. 2d 826 (1955).

15. The PUC is not bound to accept any particular method in estimating accrued depreciation which is essentially a judgment figure. If the Commission based its finding on substantial evidence, it is binding upon appellate review. *See Pittsburgh v. Pennsylvania Public Utility Commission,* 208 Pa. Superior Ct. 260, 222 A. 2d 395 (1966) ; *Pittsburgh v. Pennsylvania Public Utility Commission,* 178 Pa. Superior Ct. 46, 112 A. 2d 826 (1955).

16. Where the evidence warrants it, that is where the record establishes a *genuine* excess or deficiency, the PUC and the courts may approve the remainder life theory. *See Pittsburgh v. Pennsylvania Public Utility Commission*, 178 Pa. Superior Ct. 46, 112 A. 2d 826 (1955) ; *Harrisburg Steel Corporation v. Pennsylvania Public Utility Commission*, 176 Pa. Superior Ct. 550, 109 A. 2d 719 (1954).

In light of the above established principles of law, we have carefully read the record in this case. We conclude that there was no abuse of discretion by the PUC in adopting the reserve requirement study. The PUC was consistent in applying the same reserve requirement study methods and statistics for both accrued and annual depreciation. Furthermore, the record does not support PP&L's contention that the deficiency alleged is "genuine." PP&L contends that neither the Commission nor the protestants in the rate case proved that PP&L had abused its discretion in establishing its book reserves. Under the established law in this Commonwealth, PP&L has misplaced its burden. The burden was upon PP&L to prove that deficiency in its book reserves was "genuine." In other words, it has failed to prove that during the period of time in which the deficiency was developed that it did not receive sufficient revenue to pay all of its operating expenses plus a fair return on the fair value of its property devoted to the public service. Therefore, the PUC was within its discretionary authority to reject the remaining life theory proposed by PP&L in this case.[2]

The common sense of our holding in this case is realized when one again takes note of two basic prin-

---

[2] It is interesting to note that while PP&L claimed $33,340,125 for annual depreciation in its presentation of this case, the Commission, through the adjustments explained in its adjudication, actually allowed a higher total annual depreciation and amortization amount, viz., $34,294,153.

ciples: (1) a public utility only earns money on its rate base, and (2) it earns no money on its expenses. It necessarily follows that even if a genuine deficiency was being created on the book reserves of PP&L, then each year in which there was an accrued depreciation deficiency, the rate payers may have been paying PP&L a return (or earnings) to which PP&L would not have been entitled if a properly depreciated rate base had been determined. To whatever extent that occurred in any given year, PP&L's earnings were higher than would be permitted under the law. PP&L, in its argument before this Court attempts to minimize this mathematical fact of life; but nowhere can PP&L point to a place in the record which disproves this possible fact. Whether or not this actually occurred in any given year has not been proven by PP&L on the record in this case.

PP&L contends that the deficiency in its book reserves is dictated by current experience and knowledge, but PP&L must acknowledge that those dollar amounts indicated on its books and records for accrued depreciation were determined solely as a matter of management policy by PP&L. As this Court understands and comprehends the law, no utility can be made to accept an annual depreciation which will return to the utility less than its entire original cost investment in its plant devoted to the public service. It is an equally sound principle, however, that no utility should be permitted to claim an increased annual depreciation allowance by way of amortization over the remaining life of the property, unless the record clearly and convincingly supports its contention that the deficiency is genuine. That means that the deficiency was created during a period of time when the utility's revenues were not sufficient to recover all of its operating expenses in addition to a fair return on the fair value of its prop-

erty. PP&L had the burden of proving that the deficiency was genuine, and it failed.

In summary, we conclude that we must affirm the adjudication of the Commission and therefore, dismiss PP&L's appeal.