Philadelphia Electric Company, Petitioner *v.* Pennsylvania Public Utility Commission, Respondent.

Lukens Steel Company et al., Intervenors.

Argued June 3, 1981, before President Judge CRUMLISH and Judges ROGERS, BLATT, MACPHAIL and PALLADINO. Judges MENCER, WILLIAMS, JR. and CRAIG did not participate.

*Robert H. Young,* with him *Walter R. Hall, II,* and *Thomas P. Gadsden,* of counsel: *Edward G. Bauer, Jr.,* and *Morgan, Lewis & Bockius,* for petitioner.

*Gregg C. Sayre,* Assistant Counsel, with him, *Steven A. McClaren,* Deputy Chief Counsel, and *Joseph J. Malatesta, Jr.,* Chief Counsel, for respondent.

*Edward J. Riehl, McNees, Wallace & Nurick,* for intervenor, Lukens Steel Company.

*Martha W. Bush,* Assistant Consumer Advocate, with her *Craig R. Burgraff,* Assistant Consumer Advocate, for intervenor, Mark P. Widoff, Consumer Advocate.

*Mark B. Segal,* with him *Steven P. Hershey,* for intervenors, Consumer Education and Protective Association International, Inc. (CEPA), Association of Community Organizations for Reform Now (ACORN), and Action Alliance of Senior Citizens of Greater Philadelphia.

Opinion by Judge Rogers, August 17, 1981:

On July 27, 1979, the Philadelphia Electric Company (PECO) filed Supplement No. 6 to Tariff Electric-Pa. P.U.C. No. 25, designed to produce additional annual revenues from PECO's electric service of $122,731,000, based on a future test year ending March 31, 1980. Supplement No. 6 was to become effective on September 25, 1979. The PUC suspended operation of the proposed rates and ordered that an investigation and hearing be conducted to determine the lawfulness of the proposed rates, at R.I.D. 865.

Twenty-nine days of evidentiary hearings and five public comment hearings were conducted by an Administrative Law Judge, who thereafter issued a Recommened Decision in which he found that PECO was entitled to $79,871,000 in additional annual revenues. PECO filed exceptions to the Recommended Decision. The PUC thereafter issued an order approving rates designed to produce additional annual revenues of $88,813,000 from which PECO has appealed.

PECO contends that the PUC's order is erroneous in three respects. In this class of case our review is "limited to a determination of whether constitutional rights have been violated, an error of law committed or whether the findings, determinations or order of the Commission are supported by substantial evidence." *U.S. Steel Corp. v. Pennsylvania Public Utility Commission*, 37 Pa. Commonwealth Ct. 195, 201, 390 A.2d 849, 853 (1978).

## A. Excess Capacity Adjustment

PECO contends that the PUC improperly disallowed $25,043,000 of its claimed rate base as a dollar amount representing excess generating capacity. The PUC found that, for the test year, PECO had installed generating capacity of 7,689 megawatts (MW)

at summer estimated peak, but that it required only 6,914 MW of capacity to service its projected peak load and to maintain a generating reserve margin of 18%, which the PUC found to be the margin necessary to insure a reliability criterion of loss of load probability of one day in ten years. Thus, the PUC found that PECO had 775 MW of excess capacity, *i.e.,* capacity over and above that necessary to meet peak demand and margin.

In eliminating excess capacity from rate base, the PUC identified as the generating units most representative of excess capacity those which were the least economical—Chester 5 and 6, Richmond No. 9, Barbadoes Nos. 6 and 7 and Southwark Units 1-6, totalling 748 MW—and deducted the depreciated original cost of these units—$25,043,000—from PECO's claimed rate base.

PECO contends that because its decisions to construct the eliminated units as well as its decisions to construct every other of its generating units, when made, were prudent, the PUC may not now remove any of these properties from rate base because there is presently excess capacity. This argument, however, misses the point of the determination. The PUC's order specifically states that the PUC was "not questioning PECO's management decisions made when these units were constructed." The basis for the order is the finding that to the degree that there is excess capacity, there are generating properties which are not used and useful in rendering service to rate payers.

A unit may be properly excluded from a utility's rate base if the investment in that unit is found to be a result of managerial imprudence occurring at the time the decision to invest was made. *See, e.g., UGI Corp. v. Pennsylvania Public Utility Commission,* 49 Pa. Commonwealth Ct. 69, 86-87, 410 A.2d 923, 932

(1980). It does not follow that a unit prudently constructed must always be included in the rate base. The touchstone for determining whether or not a prudently constructed unit should be included in a utility's rate base is whether or not, during the test year involved the unit will be used and useful in rendering service to the public. *Id.* at 78, 410 A.2d at 928; *Pennsylvania Power & Light Co. v. Pennsylvania Public Utility Commission,* 10 Pa. Commonwealth Ct. 328, 334, 311 A.2d 151, 155 (1973).

> What constitutes used and useful property is committed to the discretion of the Commission. If the Commission reasonably finds that a particular class of property is not used or useful in serving the public, it may exclude the value of the property from the rate base and thus disallow the utility's return on that property.

*Bell Telephone Co. v. Pennsylvania Public Utility Commission,* 47 Pa. Commonwealth Ct. 614, 629, 408 A.2d 917, 925 (1979). Moreover, "[i]n the area of adjustments to rate base, the Commission has wide discretion." *UGI,* 49 Pa. Commonwealth Ct. at 79, 410 A.2d at 929.

The determination complained of was a proper exercise of PUC's discretion. *Cf. City of Pittsburgh v. Pennsylvania Public Utility Commission,* 370 Pa. 305, 88 A.2d 59 (1952) (although establishment of accrual basis pension plan was prudent, over-accrual of pension fund, if proven, may be excluded from operating expenses); *UGI,* 49 Pa. Commonwealth Ct. at 76-79, 410 A.2d at 928-29 (the cost of drilling unsuccessful gas wells may be excluded from rate base); *City of Pittsburgh v. Pennsylvania Public Utility Commission,* 171 Pa. Superior Ct. 187, 90 A.2d 607 (1952) (whether to include or exclude certain coal mine properties in the rate base is a decision entrusted to the PUC's discretion; "[t]he fact that a utility owns and

operates a property or a business does not, in itself, justify its inclusions in the rate base, and the burden is upon the utility to show that the property is used and useful in the public service. '' *Id.* at 201, 90 A.2d at 614.)

In removing PECO's excess capacity from the rate base the PUC's adopting one of the four methods advanced by an expert witness for the Office of Consumer Advocate, chose for removal from the rate base as representative of the excess capacity those units which were least economical. Although there were other methods available, such as factoring the excess capacity over all of PECO's units, we cannot find that the PUC erred by using the method it did. *See UGI,* 49 Pa. Commonwealth Ct. at 93-94, 410 A.2d at 935.

It is important to record that only a return on the investment is involved. The PUC did not order these units retired and it allowed PECO to continue to recover from rate payers the expenses of operating and maintaining the units in question, including depreciation. PECO's investors were denied a return *on* their investments on these units; however, they were allowed the return *of* their investments in them. This was an appropriate discharge of the Commission's duty to balance the interests of PECO's customers against those of its investors. *Pennsylvania Public Utility Commission v. Pennsylvania Gas and Water Co.* (Water Division), 492 Pa. 326, 337-38, 424 A.2d 1213, 1219 (1980).

PECO also contends that the PUC's finding of excess capacity and its methods of adjustment are not supported by substantial evidence. We do not agree. All of the PUC's findings were taken directly from, and amply supported by, the evidence adduced by the Office of Consumer Advocate and by the PUC's trial staff. PECO's complaint seems chiefly to be with

the PUC's acceptance of this evidence. Our duty is to determine only whether or not the PUC's findings are supported by substantial evidence; we may not substitute our judgment for that of the PUC, nor may we "indulge in the processes of weighing evidence and resolving conflicting testimony." *Johnstown-Pittsburgh Express, Inc. v. Public Utility Commission*, 5 Pa. Commonwealth Ct. 521, 525, 291 A.2d 545, 547 (1972).

Accordingly, we will affirm the PUC's exclusion from rate base of $25,043,000 attributable to excess capacity.

### B. SALEM NUCLEAR PLANT CONSTRUCTION

In a prior rate case, R.I.D. 438, the PUC found that PECO had not properly discharged its responsibility for the management of the Salem Nuclear Plant Unit No. 1 construction; and that, as a result, PECO's share of the cost of constructing Unit No. 1 was excessive in the amount of $10.5 million. As a consequence, the PUC refused to allow $10.5 million of the amount included by PECO in rate base.

Public Service Electric and Gas (PSE&G) built Salem No. 1. At the hearing before the Administrative Law Judge (ALJ) in the present case, PECO attempted to put into issue the adequacy of its and PSE&G's management of the construction of Unit No. 1. To this end, PECO offered the testimony of Vincent Boyer, a PECO employee, and of Stephen A. Mallard, vice president-system planning of the Public Service Electric and Gas Company. Upon motions by the Consumer Advocate (and another party), the ALJ struck from the record the testimony of Mr. Mallard and that portion of the testimony of Mr. Boyer relating to PECO's management of the construction of Unit No. 1 on the ground that the PUC's finding of mismanagement in the prior rate proceed-

ing was res judicata. The ALJ, upon a request by PECO, certified to the PUC the question of whether or not res adjudicata precluded PECO from introducing testimony relative to the construction of Unit No. 1. The PUC ruled that the ALJ had correctly stricken the proffered testimony. Thereafter, the PUC, in its final order in this proceeding, excluded $9.7 million from PECO's rate base as being the amount attributable to PECO's mismanagement of construction of Unit No. 1.

The question thus put to this Court is that of whether or not res judicata can apply to bar the relitigation of an issue involved in a prior utility rate proceeding. PECO has directed our attention to the broad language of several decisions of the courts of this Commonwealth, as well as decisions of the federal courts and other state courts, stating that res judicata is inapplicable to rate cases. Our careful study of these cases has revealed that they involved the application of res judicata to areas of rate making which the facts and circumstances controlling their solutions were subject to change—such as the reasonableness of rate schedules, determinations of fair value and fair rate of return and the propriety of items of expense. *See, e.g., U.S. Steel Corp. v. Pennsylvania Public Utility Commission,* 37 Pa. Commonwealth Ct. 195, 390 A.2d 849 (1978) (prior rate schedule); *Pennsylvania Gas & Water Co. v. Pennsylvania Public Utility Commission,* 33 Pa. Commonwealth Ct. 143, 381 A.2d 996 (1977) (prior fair value determination), *Pennsylvania Power & Light Co. v. Pennsylvania Public Utility Commission,* 10 Pa. Commonwealth Ct. 328, 311 A.2d 151 (1973) (prior accrued and annual depreciation allowance); *City of Pittsburgh v. Pennsylvania Public Utility Commission,* 178 Pa. Superior Ct. 46, 112 A.2d 826 (1955) (prior rate schedule); *City of Philadelphia v. Penn-*

*sylvania Public Utility Commission,* 173 Pa. Superior
Ct. 38, 95 A.2d 244 (1953) (prior fair value deter-
mination). *See also, e.g., Tagg Bros. & Moorehead
v. U.S.,* 280 U.S. 420 (1930) (rate schedule); *Utah
State Bd. of Regents v. Utah Public Service Commis-
sion,* 583 P.2d 609 (Utah 1978) (rate of return and
inclusion of Cost of Work in Progress in rate base).
We agree that where, as in the cases just cited, the
facts necessary to resolve the issue in question change
with time, res judicata should not apply.

The issue here—the amount of the cost of Salem
No. 1 which should be excluded from rate base on
account of assertedly imprudent management of its
construction—is historical; the facts necessary to de-
cide the question reside wholly in the past and are
not subject to change by time. The construction of
Unit No. 1 began in 1968 and concluded in 1977, when
Unit No. 1 went into commercial operation. When
the PUC determined in the prior proceeding that
PECO had imprudently failed to monitor the con-
struction of Unit No. 1 and that PSE&G had im-
prudently constructed it in some degree, all of the
facts relevant to that issue were in being and are
immutable. Courts have not always been at ease
with the broad statement of principle that res judicata
does not apply in rate cases. In *Tagg Bros., supra,*
the United States Supreme Court flatly stated that
res judicata does not apply to administrative agency
decisions. However, thirty-six years later, the Su-
preme Court stated that such language is too broad,
and that res judicata should apply where the agency's
decision is the result of a proceeding endowed with
judicial qualities. *U.S. v. Utah Construction & Min-
ing Co.,* 384 U.S. 394, 421-22 (1966). *See also Inter-
national Telephone & Telegraph Corp. v. American
Telephone & Telegraph Co.,* 444 F. Supp. 1148, 1155-
60 (S.D. N.Y. 1978). Similarly, in *Pennsylvania Gas*

& Water Co., supra, the late President Judge Bow-MAN wrote that although the PUC's prior determination of fair value may not technically be res judicata, the prior determination "provides a limit on the range of the PUC's discretion in setting fair value in a subsequent rate case" where the utility "can show the non-occurrence of change in factual circumstances having the effect of reducing the value of its property and where there has been no showing that the PUC" previously erred. *Pennsylvania Gas & Water Co.*, 33 Pa. Commonwealth Ct. at 157, 381 A.2d at 1003, and *see* cases cited therein. Furthermore, in *UGI Corp. v. Pennsylvania Public Utility Commission*, 49 Pa. Commonwealth Ct. 69, 410 A.2d 923 (1980), this Court held that if the PUC in a prior rate case had sanctioned the recovery by the utility of historically incurred unrecovered fuel costs, the recovery of these costs must be allowed in a subsequent rate case. *Id.* at 81-84, 410 A.2d at 930-31.

We believe that the wisest course to follow is that charted by Professor Davis.

As a matter of principle, it is completely clear that the reasons behind the doctrine of res judicata as developed in the court system are fully applicable to *some* administrative proceedings. The reasons against a second litigation between the same parties of the same claims or issues are precisely the same for some administrative determinations as they are for most judicial determinations. The sound view is therefore to use the doctrine of res judicata when the reasons for it are present in full force, to modify it when modification is needed, and to reject it when the reasons against it outweigh those in its favor.

Davis, Administrative Law Treatise §18.02 (emphasis in the original) (footnote omitted). Professor Davis

goes on to say by way of example that if it is found that Y's shares in Z Company were worth $10 a share in 1913 when the income tax law became effective, so that the capital gain is $40 a share when Y sold some of them in 1956, the finding is res judicata on the issue with respect to 1956 income. *Id.*, §18.03.

The instant case falls squarely within Professor Davis' example. The PUC's finding that the construction of now completed Salem Unit No. 1 was mismanaged, like the finding that Y's shares were worth $10 in 1913 and that Y realized a capital gain of $40 in 1956, is based solely on fixed past events. There is nothing in the test year used by PECO in this case, nor test years of future cases, which can alter this history. We believe, therefore, that the reason for res judicata—the desirability of giving finality to decisions and preventing the relitigation of issues involving precisely the same facts as those in finished litigation—apply here. Accordingly, we hold that res judicata may be a bar to the relitigation of an issued based on immutable facts and circumstances decided in a rate case.

Having decided that res judicata may apply to bar the relitigation of the PUC's prior determination that PECO mismanaged the construction of Unit No. 1, we must still decide whether it applies in this case. There must be a concurrence of the familiar conditions: (1) identity of the thing sued upon; (2) identity of the cause of action; (3) identity of the persons and parties to the action; and (4) identity of the quality or capacity of the parties suing or sued. *See, e.g., Thompson v. Karastan Rug Mills*, 228 Pa. Superior Ct. 260, 265, 323 A.2d 341, 344 (1974). All of these conditions are clearly present.

The remaining inquiry is that of whether the ultimate and controlling issue has been decided in a prior proceeding in which the parties had an opportunity

to appear and assert their rights. *Id.* at 226, 323 A.2d at 344.

PECO contends that it did not have the opportunity to assert its rights and fully litigate the question of the quality of the construction of Salem Unit No. 1 in the prior rate proceeding. PECO argues that the Theodore Barry and Associates report, upon which the PUC relied in deciding that the construction had been mismanaged by PSE&G was not provided it until late May, 1978 and that it had insufficient time to secure the appearance of witnesses or otherwise prepare a rebuttal to the report before the scheduled closing of the record on June 30, 1978. We are unwilling to conclude that the period of more than one month was not sufficient for PECO to prepare to arrange these matters and in any event PECO might have sought a continuance of the hearings. *See* 52 Pa. Code §3.162(a). PECO's contention that it did not seek a continuance because it badly needed early rate relief is not compelling in view of the fact that PECO was entitled to ask for interim relief. *See* Section 1308(e) of the Public Utility Code, 66 Pa. C. S. §1308(e). In fact, it requested interim relief and its request was granted by the PUC, effective July 4, 1978.

There remains a troublesome matter in this aspect of the case. As earlier noted, PECO appealed the PUC's prior determination of mismanagement in the construction of Unit No. 1. By order in that case— *Park Towne and Madway Engineers and Philadelphia Electric Co. v. Pennsylvania Public Utility Commission,* 61 Pa. Commonwealth Ct. 285,     A.2d   , (1981)—filed this day, we reversed the PUC's prior order on the ground that the PUC did not explain in a fashion which permitted review by us how, from the record (consisting on this issue of the Barry report), the PUC arrived at the figure of $10.5 disallowance

from rate base. It is true that an order is deemed final, and therefore capable of being res judicata, unless and until it is reversed. *Helmig v. Rockwell Manufacturing Co.*, 389 Pa. 21, 29, 131 A.2d 622, 626, *cert. denied*, 355 U.S. 832, *reh. denied*, 355 U.S. 855 (1957). Since the PUC's prior determination of mismanagement had not yet been reversed at the time when the PUC issued its order in the present rate case, the PUC did not err in holding that res judicata barred PECO from relitigating the issue of its mismanagement of the construction of Unit No. 1. However, although the PUC's removal of $9.7 million from PECO's rate base in the present case as the amount attributable to mismanagement of the construction of Unit No. 1 was proper when made, we may not affirm an order based on an order now reversed.

Accordingly, we will vacate the PUC's order on this issue and we remand this matter to the PUC with directions to enter an appropriate order fixing the amount of disallowance, if any, from rate base pertinent to this issue consistent with its disposition of the same issue in *Park Towne, supra.*

## C. Adjustments To Working Capital

PECO claimed $52.7 million as cash working capital includable in return. The ALJ recommended an allowance of $19.9 million and the Commission allowed $23 million. PECO's first remaining objection to the PUC's order in this regard is that the PUC improperly disallowed $9.1 million as reflecting the amount of money PECO always had in hand in revenues received and available to meet current obligations before it was required to make semi-annual payments of bond interest (and preferred dividends). PECO says that PUC erred because (1) the money it receives to pay its interest, as part of its return

allowance, belongs to it from the time of its receipt from rate payers and that this investor's money must be permitted to earn a return and (2) because recent accelerating inflation combined with the slow pace of rate cases have caused the amounts it collects from rate payers on account of its interest obligations to be less than the whole of its actual outlays for interest. PECO next contends that the PUC erroneously disallowed all except about $250,000 of its claim of $10.5 million as the amount necessary to maintain minimum bank balances. It claims entitlement to the whole $10.5 million on the general principle that as cash it is required to have cash on hand to maintain its line of credit, such cash is working capital.

We have carefully reviewed the record and ample evidence supports the PUC's determinations. Expert witnesses have for the trial staff and the Office of the Consumer Advocate provided substantial support for PUC's finding that PECO had ample working cash due to lag time between the receipt of revenues and the payment of interest and preferred dividends. The facts here are not different from those of other recent cases in which we have upheld similar disallowances. See Pennsylvania Electric Co. v. Pennsylvania Public Utility Commission, 53 Pa. Commonwealth Ct. 186, 193-94, 417 A.2d 819, 823 (1980); Peoples Natural Gas Co. v. Pennsylvania Public Utility Commission, 52 Pa. Commonwealth Ct. 201, 205-06, 415 A.2d 937, 939 (1980); UGI, 49 Pa. Commonwealth Ct. at 81, 410 A.2d at 930 (1980). PECO's argument based on its asserted ownership of revenues designed to provide it with money to pay interest and preferred dividends was rejected in UGI. With respect to PECO's claim for the inclusion in working capital of an allowance for the amount needed to maintain minimum bank balances, the PUC found that the required balances were maintained

by PECO's accounts used in its normal operations. Indeed, its treasurer testified on cross-examination that PECO does not segregate funds to satisfy minimum account balances and that its average daily balances for normal operations (for which PECO was allowed a return) had consistently satisfied its banks' minimum balance requirements.

We agree with the PUC's treatment of cash working capital.

The order of the Pennsylvania Public Utility Commission, entered May 9, 1980, insofar as it excluded $9.7 million from PECO's rate base, is vacated and the matter is remanded to the Commission for further proceedings consistent with this opinion, the Commission's order in all other respects is affirmed.

ORDER

AND Now, this 17th day of August, 1981, the order of the Pennsylvania Public Utility Commission, entered May 9, 1980, insofar as it excluded $9.7 million from PECO's rate base, is vacated and the matter is remanded to the Commission for further proceedings consistent with this opinion; the Commission's order in all other respects is affirmed.