516 A.2d 426

Pennsylvania Power & Light Company, Petitioner
v. Pennsylvania Public Utility Commission, Respondent.

Joyce Buehrle, Petitioner v. Pennsylvania Public
Utility Commission, Respondent.

Bernard King, Petitioner v. Pennsylvania Public
Utility Commission, Respondent.

Eastern Penn Energy Association, Petitioner v.
Pennsylvania Public Utility Commission, Respondent.

Argued May 14, 1986, before President Judge CRUMLISH, JR., and Judges CRAIG, MACPHAIL, DOYLE, BARRY, COLINS and PALLADINO.

*Robert H. Young,* with him, *David B. MacGregor* and *Donald F. Clarke, Morgan, Lewis & Bockius,* and *G. D. Caliendo* and *Paul E. Russell,* for petitioner, Pennsylvania Power & Light Company.

*Otto F. Hofmann,* with him, *David Scholl,* for petitioners, Joyce Buehrle and Bernard King.

*J. Jackson Eaton, III*, with him, *Thomas C. Sadler, Jr., Butz, Hudders, Tallman, Stevens & Johnson*, for petitioner, Eastern Penn Energy Association.

*Frank B. Wilmarth*, Assistant Counsel, with him, *John M. Quain*, Assistant Counsel, *Albert W. Johnson, III*, Deputy Chief Counsel, and *Charles F. Hoffman*, Chief Counsel, for respondent, Pennsylvania Public Utility Commission.

*Daniel Clearfield*, Assistant Consumer Advocate, with him, *Debra M. Kriete*, Assistant Consumer Advocate, and *David M. Barasch*, Consumer Advocate, for intervenor, Consumer Advocate.

*Henry R. MacNicholas, McNees, Wallace & Nurick*, for intervenor, Lehigh Valley Power Committee.

*Oscar B. Brumback*, for Amicus Curiae, American Society of Utility Investors.

OPINION BY JUDGE PALLADINO, October 21, 1986:

On July 27, 1984, Pennsylvania Power & Light Company (PP&L) filed Supplement No. 14 to Tariff Electric—Pa. P.U.C. No. 199, which was designed to increase PP&L's rate levels to yield additional revenues of approximately $330 million per year, based upon a test year ending March 31, 1985. The Pennsylvania Public Utility Commission (Commission) suspended operation of the proposed rate increases and ordered that hearings be held regarding their lawfulness.

Thirty-four formal complaints were filed against the proposed rate increases. These complaints were consolidated by the Commission. Two pre-hearing conferences, nineteen days of evidentiary hearings, and six public comment hearings were conducted by an Administra-

tive Law Judge (ALJ), who thereafter issued a Recommended Decision in which he found that PP&L was entitled to $236.2 million in additional revenues.

On April 26, 1985, the Commission entered an order approving rates calculated to produce additional annual revenues of only $120.8 million. In reaching its decision, the Commission imposed two "excesss capacity" adjustments on PP&L's rate proposal. One adjustment disallowed all costs associated with a temporary "buyback" by PP&L of a 10% portion of Susquehanna Steam Electric Station Unit 1 (Susquehanna 1) and Unit 2 (Susquehanna 2), which PP&L had sold to Allegheny Electric Cooperative (Cooperative). The other adjustment disallowed all return on PP&L's common equity investment in Susquehanna 2.

On May 17, 1985, PP&L filed a petition for review with this Court from the Commission's order, contending that the Commission erred by imposing the two excess capacity adjustments on the utility's rate proposal. Cross-petitions were filed by Joyce Buehrle and Bernard King, who are customers of PP&L, and by the Eastern Penn Energy Association (Association). Cross-petitioners Buehrle and King appeal from the Commission's order to the extent that it does not exclude from PP&L's rate proposal all costs associated with Susquehanna 2. The Association appeals from that part of the Commission's order which addresses rate allocation; the Association contends that the method of allocation improperly favors PP&L's residential customers at the expense of commercial and industrial customers.[1]

Our scope of review is limited to a determination of whether constitutional rights have been violated, an error of law committed or whether the findings, determi-

---

[1] Additionally, the Pennsylvania Office of Consumer Advocate (OCA) and the Lehigh Valley Power Committee are parties to this case, having intervened in all of the appeals.

nations or order of the Commission are supported by substantial evidence. *Cohen v. Pennsylvania Public Utility Commission,* 90 Pa. Commonwealth Ct. 98, 494 A.2d 58 (1985).

## A.  *Excess Capacity Adjustment Specific To Susquehanna 2*

PP&L contends that the Commission improperly applied an excess capacity adjustment which is specific to Susquehanna 2 and which disallows all return on PP&L's common equity investment in Susquehanna 2. In determining that there was such excess capacity on PP&L's system, the Commission accepted the computation of excess capacity offered into evidence by its Trial Staff witness, who testified that PP&L's peak demand of 5,284 megawatts (MW) plus a 22% reserve margin of 1,174 MW was 1,033 MW less than PP&L's net installed capacity of 7,491 MW. In recognition of the last PP&L rate proceeding concerning Susquehanna 1 (wherein the Commission also found that PP&L had 945 MW of excess capacity), and because of "the obvious causal connection between the system excess and the introduction of [Susquehanna 2]", the witness conservatively estimated the actual excess capacity to be 945 MW. (Commission's Opinion at p. 17).

On the basis of this evidence, the Commission determined that the appropriate adjustment for the excess capacity should be specific to Susquehanna 2, in acknowledgment of the fact that "the *cause* of the excess capacity on PP&L's system is the addition of [Susquehanna 2]." (Commission's Order at p. 21). Accordingly, the Commission ordered an adjustment to PP&L's rate proposal which denied PP&L all return on common equity investment in Susquehanna 2, until such time as PP&L can show (1) that the net benefits from Susquehanna 2 will exceed the net costs of the unit to PP&L's ratepayers, or (2) that the capacity from Susquehanna 2

is necessary for system reliability. The Commission did, however, allow PP&L to recover all reasonable operating, maintenance, and depreciation expenses of Susquehanna 2.

PP&L argues that the Commission erred in finding excess capacity on PP&L's system, because the formula employed by the Commission does not take into account a variety of factors which impinge upon PP&L's ability to provide reliable and economic service to its customers. Moreover, PP&L contends that the Commission's formula is inappropriate as applied to new base-load generating plants, because an excess capacity adjustment would necessarily occur whenever a utility brings a new base-load plant into service, unless the utility's existing capacity was grossly inadequate. In the alternative, PP&L argues that, assuming there is excess capacity on its system, the adjustment for such excess should not be directed specifically to Susquehanna 2 because of the following reasons: (1) Susquehanna 2 is used and useful property, upon which PP&L is entitled to a fair return on investment; (2) an adjustment specific to Susquehanna 2 is inconsistent with the Commission's system-wide excess capacity adjustment imposed when Susquehanna 1 was put into service;[2] (3) the adjustment is inconsistent with the Commission's prior approval of Susquehanna 2; and (4) the adjustment fails to balance properly the interest of PP&L's shareholders against that of PP&L's customers.

The law concerning adjustments made to a utility's rate base is well settled. A unit may be properly excluded from a utility's rate base if the investment in that

---

[2] We note that, after the Susquehanna 1 rate proceeding, in which the Commission found that PP&L had 945 MW of excess capacity on a system-wide basis, PP&L sold a 945 MW portion of its capacity to Jersey Central Power & Light Company. Accordingly, any excess capacity attributable to Susquehanna 1 is not at issue in the instant case.

unit is found to be a result of managerial imprudence occurring at the time the decision to invest was made. *Philadelphia Electric Company v. Pennsylvania Public Utility Commission,* 61 Pa. Commonwealth Ct. 325, 433 A.2d 620 (1981). It does not necessarily follow, however, that recovery of costs prudently incurred will always be allowed. *Duquesne Light v. Pennsylvania Public Utility Commission,* 96 Pa. Commonwealth Ct. 398, 507 A.2d 1274 (1986). Rather, the "touchstone for determining whether or not a prudently constructed unit should be included in a utility's rate base is whether or not, during the test year involved, the unit will be *used and useful* in rendering service to the public." *Philadelphia Electric Company,* 61 Pa. Commonwealth Ct. at 329, 433 A.2d at 623 (emphasis added).

> Our cases have held that:
> [w]hat constitutes used and useful property is committed to the discretion of the Commission. If the Commission reasonably finds that a particular class of property is not used or useful in serving the public, it may exclude the value of the property from the rate base and thus disallow the utility's return on that property.

*Cohen,* 90 Pa. Commonwealth Ct. at 105, 494 A.2d at 61, *quoting Bell Telephone Company v. Pennsylvania Public Utility Commission,* 47 Pa. Commonwealth Ct. 614, 629, 408 A.2d 917, 925 (1979). Furthermore, we have noted that, "[i]n the area of adjustments to rate base, the Commission has wide discretion." *UGI Corp. v. Pennsylvania Public Utility Commission,* 49 Pa. Commonwealth Ct. 69, 79, 410 A.2d 923, 929 (1980). Applying the above-mentioned principles to the case at bar, we conclude that the adjustment imposed by the Commission was well within the ambit of its discretion and must be upheld.[3]

---

[3] Appellants Buehrle and King contested the Commission's order on the ground that the Commission should have imposed an

As the Commission noted, the prudence of constructing Susquehanna 2 was not formally challenged by any party before the Commission and therefore is not at issue in the case at bar. The parties have vigorously contested, however, the question of whether Susquehanna 2 is used and useful in rendering service to the public.

Addressing PP&L's contention that the Commission's formula fails to consider all of the factors pertinent to the determination of whether a generating plant is used and useful, we begin by noting that the term "used and useful," as applied to a utility's return on its investment, is codified in Section 1310(d) of the Public Utility Code,[4] which provides that a utility is entitled to "a fair return upon the fair value of the property of such public utility, used and useful in its public service." In the instant case, the Commission has interpreted the word 'useful' as requiring that:

> the plant and its associated capacity contribute no more than necessary to system *reliability* in the accepted, technical sense. In other words, the question is whether the Company's total capacity, including the plant in question, is commensurate with the requirements for peak demand plus a reasonable reserve margin relative to the Company's own system and to its PJM obligation.

(Commission's Opinion at p. 17).

The interpretation given a statute by the agency charged with its execution and application is entitled to

---

adjustment which denied all costs associated with Susquehanna 2, rather than the denial merely of PP&L's return on common equity investment. Because we determine that Commission's determination was a proper exercise of the Commission's discretion, our discussion as it relates to PP&L's contentions is equally dispositive of the arguments made by Buehrle and King.

[4] 66 Pa. C. S. §1310(d).

great weight and should be disregarded or overturned only for cogent reasons or if such construction is clearly erroneous. *Chappell v. Pennsylvania Public Utility Commission*, 57 Pa. Commonwealth Ct. 17, 425 A.2d 873 (1981). Accordingly, because we determine that the Commission's interpretation of the phrase "used and useful" is a reasonable one, we will not overturn it.

Admittedly, the Commission's method of calculating excess capacity does not expressly consider the factors which PP&L contends are relevant in determining whether a utility has sufficient reserve capacity to insure system reliability.[5] We have never imposed upon the Commission, however, the burden of making its calculations in the most mathematically precise manner possible, as long as the Commission's methods reach a result that is otherwise just and reasonable. As applied to the facts presented in the case at bar, the Commission's formula does reasonably compare PP&L's generating capacity to its projected demand requirements for the next five years, as supported by expert witnesses for the Commission's Trial Staff and the OCA. Under the circumstances, therefore, the Commission's formula adequately calculates PP&L's excess capacity, and no more is required.

As for PP&L's contention that application of the Commission's excess capacity formula to new generating plants is unfair and amounts to an abuse of discretion, we determine that, as applied to the facts of the instant case, this argument must be rejected. The Commission found that PP&L presently possesses an extremely large amount of excess capacity which will not be need-

---

[5] PP&L argues that the factors to be considered in determining sufficient reserve capacity should include: the effects of expansion and recession in the area's economy; increased peak demand in colder than normal winter weather; and the desirability of having diversity in the types of generating plants maintained by the utility.

ed by PP&L for its demand requirements until well into the next decade, if at all. Our review of the record proves that this finding is supported by substantial evidence. Accordingly, this is not a case where the mere introduction of a new base-load system has resulted in temporary excess capacity, but is rather an anomalous situation wherein, as the Commission noted, "the sheer magnitude of the present excess capacity and the number of years which it will persist render meaningless the Company's arguments about the temporary effect of adding large base load plants." (Commission's Opinion at p. 19).

We note that, in the proper case, it may be possible that a new generating plant is "used and useful" despite the fact that its capacity is not immediately needed to insure that a utility has an adequate reserve capacity. The case at bar, however, is not such a case because, under any standard, the capacity PP&L possesses beyond that necessary for its reserve requirements is not used and useful.

Addressing PP&L's argument that the adjustment for any excess capacity should not be directed specifically at Susquehanna 2, we conclude that, despite PP&L's assertions to the contrary, the Commission in its opinion adequately made out a finding that Susquehanna 2 was not "used and useful", in that the Commission found the excess capacity on PP&L's system to be directly attributable to Susquehanna 2. Because Susquehanna 2 was the newest addition to PP&L's system, and because, prior to the commencement of Susquehanna 2's operation, PP&L's system was not burdened by excess capacity, the Commission did not abuse its discretion by concluding that Susquehanna 2 was the cause of PP&L's excess capacity. Although there were other methods available of allocating excess capacity, such as factoring the excess over a system-wide slice of PP&L's generating

units, we cannot find that the Commission erred by using the method it did. *See Philadelphia Electric Company,* 61 Pa. Commonwealth Ct. at 330, 433 A.2d at 623.

Indeed, our conclusion is buttressed by the fact that we consider the Commission's allocation· of excess capacity in this case to be an appropriate discharge of its duty to balance the interests of PP&L's customers against those of its investors. *Pennsylvania Electric Company v. Pennsylvania Public Utility Commission,* 509 Pa. 324, 502 A.2d 130 (1985). As our Supreme Court noted in *Pennsylvania Electric Company,* the "focus of inquiry is properly upon the 'total effect' of the rate order, rather than upon the rate-setting method employed." *Id.* at 329, 502 A.2d at 133. In the case at bar, the Commission's order allows PP&L to recover from its ratepayers the expenses of operating and maintaining Susquehanna 2, which PP&L was properly entitled to recover. *UGI Corp.; see also Cohen* and *Philadelphia Electric Company.* The Commission denied, however, a return on PP&L's common equity investment in Susquehanna 2 until such time as PP&L can show that the capacity produced by Susquehanna 2 is used and useful. Despite PP&L's contention that such allocation of the excess capacity burden falls unfairly on its investors, the Commission determined that such a balancing of competing interests was fair, in that the risk of excess capacity is properly· laid more heavily on PP&L's shareholders, who voluntarily assumed that risk in the first instance by investing in Susquehanna 2. Because this determination was made within the broad boundaries of the Commission's discretion and is supported by substantial evidence of record, this Court may not indulge in the process of reweighing the evidence and must uphold the Commission's decision on this matter. *Philadelphia Electric Company.*

As regards PP&L's contention that an adjustment specific to Susquehanna 2 is inconsistent with the Commission's system-wide adjustment imposed when Susquehanna 1 was put into service, we conclude that this argument is without merit. In both instances, the Commission acted to set "just and reasonable" rates: that is to say, rates which strike an "appropriate balance between prices charged to utility customers and returns on capital to utility investors." *Pennsylvania Electric Company,* 509 Pa. at 329, 502 A.2d at 133. Admittedly, the specific adjustment imposed on Susquehanna 2 places a greater share of the burden on PP&L's investors than did the system-wide adjustment for Susquehanna 1. We determine, however, that the Commission did not abuse its discretion in allocating the burden as it did, especially in light of the fact that the circumstances concerning each of the adjustments are not identical.

As PP&L emphasizes in its brief, certain benefits inure to ratepayers from a utility's having diverse types of generating plants. When Susquehanna 1—PP&L's first nuclear generating plant—was put on line, therefore, PP&L's customers benefited from such diversity and could reasonably be required to bear a concomitant share of the Susquehanna 1 burden. This justification for a system-wide excess capacity adjustment is not present to the same extent in the case of Susquehanna 2, however, because the desired diversity had already been accomplished when Susquehanna 1 was put into service. Accordingly, the Commission could reasonably conclude that the ratepayer's share of the Susquehanna 2 burden should, in fairness, be less than their share of the burden from Susquehanna 1.

Finally, we reject PP&L's argument that an adjustment specific to Susquehanna 2 is inconsistent with the Commission's prior approval of Susquehanna 2. To the extent that the Commission's approval of various construction and security applications can be construed as

approval of Susquehanna 2 itself, such an argument goes merely to the *prudence* of constructing Susquehanna 2. As we have already noted, however, the prudence of Susquehanna 2 is not at issue in this case and is therefore irrelevant to both the Commission's and our determination.

## B. *Excess Capacity Adjustment on PP&L's Buy-Back of Capacity From the Cooperative*

PP&L contends that the Commission abused its discretion by disallowing all costs associated with PP&L's temporary buy-back of the capacity it had sold to the Cooperative, because the buy-back was commercially prudent on PP&L's part in that it was necessary to induce the Cooperative to invest in the Susquehanna Electric Station. Notwithstanding the fact that PP&L's action may have been prudent, the buy-back of capacity from the Cooperative clearly resulted in more excess capacity for PP&L because, as the Commission found, the repurchased capacity was not "used and useful" in PP&L's system. Therefore, the Commission could and did properly deny PP&L any return on its investment related to the buy-back. *Philadelphia Electric Company.*

Moreover, under the facts of this case, the Commission did not abuse its discretion in denying PP&L all *costs* associated with the buy-back. As mentioned above, it is the duty of the Commission to balance the interests of shareholders and ratepayers in allocating the burden of excess capacity. In the instant situation, the evidence of record indicates that PP&L's ratepayers receive no present benefit from the repurchase of capacity from the Cooperative. Accordingly, the Commission acted within its discretion in determining that PP&L's shareholders should assume the entire burden of the buy-back.

## C. *Allocation of Rate Increase Among PP&L's Customers*

In addressing the Association's appeal on the question of whether the rate allocation method approved by the Commission improperly burdens certain classes of PP&L's commercial and industrial customers, we are guided by the following principles: (1) the question of reasonableness of rates and the difference between rates in their respective classes is an administrative question for the Commission to decide, and this Court's scope of review is limited, *Park Towne v. Pennsylvania Public Utility Commission*, 61 Pa. Commonwealth Ct. 285, 433 A.2d 610 (1981); (2) rate structure is a matter peculiarly within the Commission's flexible limit of judgment, *Id*.; and (3) the burden of proving that rates set by the Commission are discriminatory is on the customers challenging such rates. *Id*.

In determining how to allocate PP&L's revenue increase among its customers, the Commission adopted a cost of service study incorporating the "12 Coincident Peak" method of allocation, which measures the demand of each respective class of service on the peak day of each of the twelve months in the test period. The Association objects to the use of this method because, according to the Association, the 12 Coincident Peak method does not take into account the fact that PP&L experiences its peak demand times in the winter months.

We note, however, that in choosing the 12 Coincident Peak method, the Commission concluded that:

PP&L is a winter peaking company; however, the Company's participation in the PJM pool (other members of which are summer peaking companies) allows the Company to maintain a reduced reserve requirement than otherwise would be required. We find PP&L's use of the

twelve month coincident peak allocation methodology acceptable for cost of service allocation purposes.

Because the Commission's decision on this issue is supported by substantial evidence of record, in the form of testimony by PP&L's expert witness, and because the Commission committed no error of law or abuse of discretion in choosing to adopt the 12 Coincident Peak method, the Commission's method of allocating PP&L's rate increase must be upheld.

### ORDER

AND NOW, October 21, 1986, the order of the Pennsylvania Public Utility Commission at Docket No. R-842651, dated April 26, 1985, is affirmed.

Judge COLINS dissents.