540 A.2d 966

David M. Barasch, Consumer Advocate, Petitioner v. Pennsylvania Public Utility Commission, Respondent.

University of Pennsylvania/Utility Users Committee, Inc., Petitioner v. Pennsylvania Public Utility Commission, Respondent.

Philadelphia Electric Company, Petitioner v. Pennsylvania Public Utility Commission, Respondent.

148

Argued December 16, 1987, before President Judge CRUMLISH, JR., and Judges CRAIG, MACPHAIL, DOYLE, BARRY, COLINS and PALLADINO.

*Scott J. Rubin,* Assistant Consumer Advocate, with him, *Irwin A. Popowsky,* Assistant Consumer Advocate, *David Wersan,* Assistant Consumer Advocate, and *David M. Barasch,* Consumer Advocate, for petitioner, David M. Barasch, Consumer Advocate.

*Larry B. Selkowitz,* with him, *Mark P. Widoff, Widoff, Reager, Selkowitz & Adler, P.C.,* for petitioner, University of Pennsylvania/Utility Users Committee, Inc.

*Robert H. Young,* with him, *Jay H. Calvert, Jr., John F. Stillmun, III, Thomas T. Loder, Walter R. Hall, II, Jack E. Jarrett,* and *Michael A. McGrail,* for petitioner/intervenor, Philadelphia Electric Company.

*Bohdan R. Pankiw,* Deputy Chief Counsel, with him, *Louis G. Cocheres,* Assistant Counsel, and *Daniel P. Delaney,* Chief Counsel, for respondent, Pennsylvania Public Utility Commission.

*David M. Kleppinger,* with him, *Richard S. Kahlbaugh, McNees, Wallace & Nurick,* for intervenor, Philadelphia Area Industrial Energy Users Group.

OPINION BY JUDGE PALLADINO, March 31, 1988:

Appeals from an order of the Pennsylvania Public Utility Commission (PUC) entered on June 27, 1986 have been consolidated and are presently before us for disposition. In 2248 C.D. 1986 and 2269 C.D. 1986, David M. Barasch, Consumer Advocate, hereinafter the Office of Consumer Advocate (OCA), and University of Pennsylvania, Utility Users Committee (UUC/UP) have petitioned for review of the PUC's June 27, 1986 order. Also, Philadelphia Area Industrial Energy Users Group (PAIEUG) and Philadelphia Electric Company (PECO) have filed briefs as intervenors. In 2279 C.D. 1986, PECO has petitioned for review of the PUC's June 27 order, and OCA has filed a brief as an intervenor.

All of the present appeals stem from the PUC's resolution of PECO's request for a rate increase. On September 15, 1985, PECO filed supplement No. 15, which was designed to produce an annual base rate increase of $681.8 million.[1] The PUC, by order entered November 1, 1985, allowed the supplement to be suspended by operation of law until June 27, 1986. The PUC then initiated an investigation into the lawfulness, justness and reasonableness of the proposed rates. The case was assigned to an administrative law judge (ALJ).

The ALJ held over thirty hearings, during which the parties presented voluminous testimony and evidence. On May 13, 1986, the ALJ issued his recommended decision. Exceptions were filed to the ALJ's opinion, and on June 27, 1986, the PUC entered its order, supple-

---

[1] This figure is rounded up. The exact proposed increase was $681,760,000. PECO arrived at this figure by calculating an "$893 million increase in rates to reflect operating expenses, and a $207.5 million rate decrease to reflect the reduction in energy costs occasioned by the operations of Limerick Unit No. 1. . . . if operated at a certain capacity level." *Pennsylvania Public Utility Commission v. Philadelphia Electric Company*, 61 Pa. PUC 589, 594 (1986).

mented with a lengthy opinion,[2] disposing of the exceptions. The June 27, 1986 order is as follows:

IT IS ORDERED:

1. That Philadelphia Electric Company not place into effect the rates contained in Supplement No. 15 to its Tariff Electric-Pa. P.U.C. No. 26, the same having been found to be unjust, unreasonable and, therefore, unlawful.

2. That Philadelphia Electric Company is hereby authorized to file tariffs or tariff supplements containing rates, provisions, rules and regulations, consistent with our findings herein, designed to produce annual operating electric revenues of not in excess of $2,852,071,000, exclusive of revenues to be derived from the State Tax Adjustment Surcharge revenues; provided however, that the $350,797,000 annual revenue increase herein authorized must be phased-in over a three year period, with deferred revenues being recovered in the fourth, fifth and sixth year.

3. That said tariffs or tariff supplements may be filed upon less than statutory notice, and, pursuant to the provisions of 52 Pa. Code §3.32(b), the tariffs or tariff supplements may be filed to be effective for service rendered on and after the date of entry of this Opinion and Order.

4. That the tax surcharge shall be computed in accordance with the State Tax Adjustment Surcharge Order of March 10, 1970, as revised.

5. That Philadelphia Electric Company shall file detailed calculations with the tariff filing which shall demonstrate to the Commission's

---

[2] Commissioner Bill Shane dissented. *See* 61 Pa. PUC at 694.

satisfaction that the filed rates comply with this Opinion and Order.

6. That Philadelphia Electric Company shall comply with all other directives contained in this Opinion and Order which are not the subject of an individual directive in the proceeding Ordering Paragraphs, as fully as if they were the subject of a specific Ordering Paragraph.

7. That except as herein granted, the exceptions of all parties to the Recommended Decision are denied.

8. That the several complaints filed by various parties to this proceeding, including those which were consolidated with Docket No. R-850152, are granted or denied consistent with this Opinion and Order.

9. That except as herein modified, the Recommended Decision of Administrative Law Judge MATUSCHAK is adopted as the decision of this Commission.

10. That upon the filing of tariff revisions acceptable to the Commission as being in compliance with this Opinion and Order and upon Commission approval of the tariff revisions, the inquiry and investigation at Docket No. R-850152, et al., shall be terminated and the record marked closed.

*Pennsylvania Public Utility Commission v. Philadelphia Electric Company,* 61 Pa. PUC 589, 685-86 (1986).

Following issuance of the decision, numerous petitions for reconsideration were filed. OCA filed such a petition on June 27, 1986, asserting that the decision was erroneous because it did not find that PECO created excess generating capacity by placing into service the Limerick I nuclear generating station. On July 10, 1986, OCA filed a supplemental petition for reconsider-

ation, asserting that §1323 of the Public Utility Code[3] (Code), enacted to become effective on July 10, 1986, was now applicable to the proceedings, and required the PUC to review, in light of the new section,[4] the lack of a finding that PECO had excess generating capacity as a result of Limerick I. On July 15, 1986, the Governor's Energy Council (GEC)[5] filed a petition for reconsideration and on July 16, 1986, UUC/UP filed a supplemental petition for reconsideration, with both the GEC and UUC/UP asserting §1323 should be applied to the proceedings.

---

[3] 66 Pa. C. S. §1323.

[4] Section 1323 provides, in part:

§1323. Procedures for new electric generating capacity.

(a) Excess capacity costs.—Whenever a public utility claims the costs of an electric generating unit in its rates for the first time and the commission finds that the unit results in the utility having excess capacity, the commission shall disallow from the utility's rates, in the same proportion as found to be excess capacity:

(1) the return on specific unit or units of any excess generating reserve;

(2) the return on the average net original cost per megawatt of the utility's generating capacity; or

(3) the equity investment in the new unit.

In addition to the disallowances set forth in this subsection, the commission may disallow any other costs of the unit or units which the commission deems appropriate. For the purposes of this section, a rebuttable presumption is created that a unit or units or portion thereof shall be determined to be excess unless found to be needed to meet the utility's customer demand plus a reasonable reserve margin in the test year or the year following the test year, or, if it is a base load unit, it is also found to produce annual economic benefits which will exceed the total annual cost of the plant during the test year or within a reasonable period following the test year.

[5] GEC is not involved in the present appeals.

By order entered July 25, 1986, the PUC denied all petitions for reconsideration of its June 27, 1986 order. Appeal to this court followed. We shall address the issues raised in 2248 C.D. 1986 and 2269 C.D. 1986 together, as they are sufficiently similar to warrant such treatment. Resolution of the issues raised by PECO in 2279 C.D. 1986 requires separate treatment, and shall follow our disposition of the appeals at 2248 and 2269.

### No. 2248 C.D. 1986 AND No. 2269 C.D. 1986

The first issue to be addressed is whether the PUC erred in refusing to apply §1323 to the proceedings. The sequence of PUC orders is fundamental to the discussion of the applicability of §1323. The PUC's order was entered on June 27, 1986. Petitions for reconsideration were filed prior to July 10, 1986, and supplemental petitions were filed after July 10, 1986. All petitions for reconsideration were denied on July 25, 1986. Section 1323 was expressly made "applicable to all cases pending before the commission."[6] Section 1323 became effective on July 10, 1986. Thus, all cases pending before the PUC on July 10, 1986 were subject to the new section. The question before us, then, is whether the present case was pending before the PUC on July 10, 1986.

OCA, UUC/UP and PAIEUG (hereinafter Petitioners for purposes of this discussion) argue that the case was pending before the PUC on July 10, 1986. The PUC and PECO argue that it was not. For the reasons set forth below, we hold that the case was not pending before the PUC on July 10, 1986.

Petitioners advance numerous arguments in support of their position. Their arguments can be summarized as follows: 1) a case is pending until its final disposition on appeal or, if no appeal is taken, at the end of the

---

[6] Act of July 10, 1986, P.L. 1238, §19.

appeal period; 2) the present case *must* have been pending before the PUC on July 10, because no party had appealed as of that date; because no appeal had been taken, this court did not have jurisdiction and, consequently, the PUC must still have had jurisdiction; 3) petitions for reconsideration had been filed and, on July 10, the PUC had *authority* to grant those petitions; although the PUC later denied the petitions, its continuing authority to take action impacting on the case leads inexorably to the conclusion that the case was pending; and 4) the terms of the June 27 order make clear the pendency of the case, *i.e.*, the order specifically left open the record subject to PUC approval of tariffs to be submitted by PECO; because the PUC did not actually approve the tariffs submitted by PECO until July 25, 1986,[7] the case must have been pending on July 10.

In support of their position, Petitioners rely heavily on *Groff v. Township of Ulster,* 65 Pa. Commonwealth Ct. 584, 442 A.2d 1255 (1982) and *Barasch v. Pennsylvania Public Utility Commission,* 507 Pa. 430, 490 A.2d 806 (1985). However, as our discussion shall make clear, neither case mandates the result sought by Petitioners and, in fact, application of the proper legal principles mandates our affirmance of the PUC's decision not to apply §1323.

We begin by noting that an action is pending until a final adjudication has been issued. *Robinson Township School District v. Houghton,* 387 Pa. 236, 128 A.2d 58 (1956). Thus, the true inquiry here is whether the PUC order of June 27 was a final adjudication. A final adjudication is traditionally embodied in a final order of a court or administrative agency. In the present case, the order in question has all the earmarks of a final order:

---

[7] The docket entries in this proceeding reveal that the investigation was closed on July 25, 1986.

"A final order is one that: (1) ends the litigation, or alternatively, disposes of the entire case; or (2) has the practical consequence of putting the litigant 'out of court.' " 1 Darlington, McKeon, Schuckers and Brown, *Pennsylvania Appellate Practice* §341:2 (footnotes omitted). The PUC order of June 27 ended the "litigation" *and* put the parties "out of court." With these principles in mind, we shall address Petitioners' arguments, including their reliance on *Groff* and *Barasch*.

Petitioners first argue that a case is pending until its final disposition on appeal or, if no appeal is taken, at the end of an appeal period. We cannot agree. Petitioners' logic would have the effect of keeping every case "open" throughout the appeal period, regardless of whether an appeal is actually taken. Petitioners rely almost exclusively on the *Groff* decision to support this thesis. Although one sentence in *Groff* does support Petitioners' analysis, careful review of the opinion and the precedents it relies upon makes clear that *Groff* is not intended to stand for the proposition urged by Petitioners.

In *Groff*, this court stated that intervention pursuant to Pa. R.C.P. 2327 was permitted only during the pendency of an action. Thus, we affirmed the trial court's denial of a petition to intervene filed subsequent to the final disposition of the case in the lower court. The final order of the lower court was entered on May 29, 1980, with the appeal period ending on June 28, 1980. The petition to intervene was not filed until July. In an unfortunate choice of language, perhaps designed to indicate the hopeless tardiness of the petition to intervene, we stated:

Pendency is the state of an action after it has been begun and before the final disposition of it. The action in the instant case had been finally disposed of and concluded on June 28, 1980,

> following the end of the appeal period applicable to the lower court's decree absolute of May 29, 1980. The petition to intervene was not filed until July 8, 1980, at which time there was no proceeding pending. . . .

65 Pa. Commonwealth Ct. at 587, 442 A.2d at 1256.

This court relied on three precedents in support of this conclusion, namely, *Robinson Township; Howell v. Franke*, 393 Pa. 440, 143 A.2d 10 (1958); and *Admiral Homes, Inc. v. Floto Management Corp.*, 397 Pa. 509, 156 A.2d 326 (1959). In *Robinson Township* the Pennsylvania Supreme Court stated:

> We are aware that each of two commentaries on our Rules of Civil Procedure expresses the opinion that, for the purpose of intervening, an action is pending from the moment it is first brought until the record of the action is removed on appeal. Neither cites any authority for the dictum whose inherent error is patent, upon a moment's reflection, and does not require further discussion.

387 Pa. at 241-42, 128 A.2d at 61. It cannot be argued that the *Robinson Township* opinion supports the quoted *Groff* language. *Howell* and *Admiral Homes* merely reiterate the principle that Pa. R.C.P. 2327 allows intervention only during the pendency of an action; thus, after final adjudication such an application comes too late. *Howell*, 393 Pa. at 443, 143 A.2d at 11; *Admiral Homes*, 397 Pa. at 511, 156 A.2d at 327-28. None of these decisions supports the proposition that a case is pending until final disposition on appeal. In fact, *Robinson Township* states that such a proposition is patently erroneous. Thus, to the extent that *Groff* supports such a proposition, it is overruled.

Petitioners next argue that the case must have been pending before the PUC on July 10 because no appeal

had yet been taken. We do not agree. As noted earlier, the true issue here is whether the PUC issued a final order on June 27. The existence of, or lack of, an appeal from that order does not answer the question of whether the order was final. Petitioners assert that this court did not yet have jurisdiction, which is true, but it does not necessarily follow that the PUC retained jurisdiction. In fact, the PUC relinquished its jurisdiction by issuing a final order.

Petitioners next argue that because petitions for reconsideration had been filed, both before and after the new law became effective, and because the PUC had authority to grant those petitions, the case was, necessarily, pending before the PUC. Again, we do not agree. If the PUC had granted the petitions for reconsideration, it would have been reasserting its jurisdiction over the matter. The PUC chose not to do so. Although it cannot be disputed that petitions for reconsideration were pending before the PUC, *the case* was not pending.[8]

Finally, Petitioners argue that the very terms of the order demonstrate its lack of finality. Petitioners direct us to paragraph 10 of the June 27 order, which states that the investigation shall terminate and the record be closed upon PECO's filing of, and the PUC's approval of, tariff revisions. We note that paragraph 5 of the order directs PECO to "file detailed calculations with the tariff filing which shall demonstrate to the [PUC's] satisfaction that the filed rates comply with this Opinion and Order." Also, paragraph 2 of the order authorizes PECO to file tariffs or tariff supplements designed to produce a

---

[8] We find the parties' discussion of Pa. R.A.P. 1701 to be irrelevant. Rule 1701 deals with the authority of trial courts and agencies *after* an appeal has been taken. Appeals from the PUC June 27 order were not taken until after reconsideration was denied on July 25, 1986.

$351 million[9] annual revenue increase to be phased in over a three year period.

Petitioners argue that the June 27 order demonstrates, on its face, that the case was pending before the PUC. We recognize some merit in this argument. However, the fact that the record was not officially closed does not change our conclusion that the PUC order of June 27 was a final one. "[T]he finality of an order is a 'judicial conclusion' that can be reached only after an examination of the order's ramifications. In so doing, the court will look beyond the technical effect of the adjudication and base its decision on the practical effect." 1 Darlington, McKeon, Schuckers and Brown, *Pennsylvania Appellate Practice* §341:2. *See Praisner v. Stocker,* 313 Pa. Superior Ct. 332, 337, 459 A.2d 1255, 1258 (1983) and cases cited therein *and Bell v. Beneficial Consumer Discount Co.,* 465 Pa. 225, 348 A.2d 734 (1975).

Review of the PUC's June 27 order establishes that the only matter left "open" was PECO's calculation of the tariffs which would provide the increase allowed by the PUC. There is no dispute that the June 27 order granted an increase in rates to PECO. Furthermore, the amount of the increase was determined and the time-frame for the increase was established. The only remaining matter was the calculations which would yield the rate increase allowed. Thus, the order finally determined the issue which brought the matter before the PUC, *i.e.*, PECO's request for an increase in rates. Thus, we conclude that the June 27 order[10] was a final

---

[9] This figure is rounded up. The specific increase was $350,797,000.

[10] PECO points out that June 27, 1986 was the last date upon which a final order could be issued in order to prevent PECO's *proposed* rate from going into effect. *See* 66 Pa. C. S. §1308(d).

order.[11] Accordingly, the case was not pending before the PUC on July 10, 1986 and §1323 was not applicable.

We turn now to Petitioner's other arguments to this court, which can be summarized as follows: 1) the PUC erred in finding that the Limerick I plant is used and useful; accordingly, the PUC erred in allowing PECO to include part of the costs of the Limerick I plant in its rate base; 2) the PUC erred in departing from its own precedents without explanation; and 3) the PUC erred in basing its conclusion of used and useful solely on its finding that no excess generating capacity was created by Limerick I. We shall address these issues in order, following a brief recitation of facts and law which provide the background of the present appeal.

Limerick is a nuclear electric generating station. 61 Pa. PUC at 594-95. It is composed of Limerick I and

---

[11] Our conclusion is supported by the Pennsylvania Supreme Court's decision in *Barasch*. Although Petitioners assert that *Barasch* requires the application of §1323, that decision in fact operates against Petitioners' assertion. In *Barasch,* this court held that §1315 of the Code was inapplicable because its language did not manifest a legislative intent that it be applied retroactively. *Green v. Pennsylvania Public Utility Commission,* 81 Pa. Commonwealth Ct. 55, 69-70, 473 A.2d 209, 217-218 (1984), *aff'd sub nom. Barasch v. Pennsylvania Public Utility Commission,* 507 Pa. 430, 490 A.2d 806 (1985). Although the Supreme Court affirmed, it specifically held that the language of §1315 was plain and unambiguous and was intended to be retroactively applied. 507 Pa. at 438, 490 A.2d at 810. However, in enacting §1315 the legislature stated that it was "applicable to all proceedings pending before the Public Utility Commission and the courts at this time." Section 1315 became effective on December 20, 1982. At that time, appeal to this court had been perfected. *See Green,* 81 Pa. Commonwealth Ct. at 57, 473 A.2d at 212. In contrast to the language used by the legislature in enacting §1315, the section presently at issue does not manifest a legislative intent that it be applied retroactively. Section 1323 was made expressly applicable *only* to cases pending before the commission, not those pending before the courts.

Limerick II. *Id*. at 595. Limerick I went into actual commercial operation in February of 1986, while construction of Limerick II had not yet been completed at the time of June 27, 1986 PUC decision. *Id*. Both units of the Limerick project will use a common plant. *Id*.

. We begin by noting that if a plant is not used and useful it will not be included in a utility's rate base. *Pennsylvania Power & Light v. Pennsylvania Public Utility Commission,* 101 Pa. Commonwealth Ct. 370, 516 A.2d 426 (1986). As we stated in *Pennsylvania Power & Light,* the PUC has wide discretion in the area of adjustments to rate base. 101 Pa. Commonwealth Ct. at 376, 516 A.2d at 430 (quoting *UGI Corp. v. Pennsylvania Public Utility Commission,* 49 Pa. Commonwealth Ct. 69, 79, 410 A.2d 923, 929 (1980)). Petitioners contend that the PUC erred in finding that Limerick I is used and useful and therefore erred in allowing Limerick I to be included in PECO's rate base. Specifically, Petitioners argue that the PUC's determination of used and useful was based on its finding that Limerick I did not create excess generating capacity, and Petitioners assert that that finding ignores almost all the evidence. Our scope of review is limited to a determination of whether an error of law has been committed, constitutional rights have been violated or if there is substantial evidence to support findings, determinations or the order of the PUC. *Carbonaire Company, Inc. v. Pennsylvania Public Utility Commission,* 114 Pa. Commonwealth Ct. 124, 538 A.2d 959 (1988).

One aspect of Petitioners' argument is that the PUC ignored evidence that, before Limerick I went into operation, PECO attempted to sell its share of another nuclear plant (Salem 2)[12] to other utilities, and that the

---

[12] PECO's share of Salem 2 comprises 471 megawatts.

PUC also ignored evidence that PECO prematurely retired combustion turbines producing 458 megawatts. Petitioners assert that these figures conclusively establish PECO's excess generating capacity. According to Petitioners, if PECO could afford to give up this much power, it must have had excess generating capacity. Our review of the record demonstrates that the PUC did not ignore evidence and that its finding is supported by substantial evidence.

In its decision, the PUC stated:

The ALJ has concluded that, with Limerick on line, PECO has a reserve margin of 28% over peak requirements. He notes that this is 3% greater than the Company's planning objective of 25%, but since base load capacity is not added megawatt by megawatt a 'reasonable increase in reserve capacity must be allowed before excess capacity comes into play' (R.D. page 74). The ALJ finds that the record in this case fails to substantiate any PECO excess capacity.

We agree with and adopt ALJ MATUSCHAK's recommendation on this issue. Accordingly, we will not make any of the adjustments proposed by the various Complainants here.

61 Pa. PUC at 615. The PUC thoroughly reviewed the retirement issue and, noting that the two combustion turbine units in question were 35 and 38 years old, agreed with the ALJ that they were not prematurely retired.[13] The PUC then expanded on the ALJ's reasoning, and stated that OCA's exception to the ALJ's resolution of the retirement issue ignored the purpose which the combustion turbines were intended to serve. PECO

---

[13] The ALJ stated, and the PUC agreed, that PECO routinely projects a 35 year life for units such as those at issue here. 61 Pa. PUC at 614.

asserted to the PUC that the combustion turbine capacity was intended only as an interim measure until new baseload capacity could be built. Our review establishes that what Petitioners are so arduously contesting is the PUC's acceptance of PECO's evidence on the retirement issue. The PUC decision makes clear that substantial evidence supports its finding on retirement of the combustion turbines. Accordingly, we reject Petitioners' arguments on this issue. *See Philadelphia Electric Company v. Pennsylvania Public Utility Commission*, 61 Pa. Commonwealth Ct. 325, 331, 433 A.2d 620, 624 (1981).

With regard to the attempted sale issue, we note that Petitioners do not assert that PECO actually sold its share of Salem 2, merely that such a sale had been attempted. Although we would be assisted in our review if the PUC had expressly discussed this attempted sale, we believe the PUC decision adequately addressed the issue. As noted above, the ALJ concluded that the operation of Limerick provided PECO with a reserve margin of 28% over peak requirements, and that such a reserve capacity did not constitute excess capacity. 61 Pa. PUC at 615. The PUC accepted and adopted the ALJ's recommendation on this issue. *Id.* The PUC's conclusion of no excess capacity obviously negates Petitioners' assertion that excess capacity existed, and this is true regardless of Petitioners' allegations as to what created the non-existent excess capacity. Thus, we are not persuaded by Petitioners' argument on this issue.

Petitioners next argue that the PUC erred in departing from its own precedents without explanation. However, Petitioners' entire argument is based on the thesis that in prior cases where excess capacity was found to exist, the PUC has made an adjustment in rates.[14]

---

[14] Petitioner OCA stated in its brief:

The Commission has considered many times whether an electric utility had excess generating capacity. In four of

Thus, Petitioners' argument is premised on their assertion that the PUC erred in concluding no excess capacity existed. Inasmuch as we have upheld the PUC's finding on the excess capacity issue, we need not address Petitioners' departure from precedent issue.

We turn now to the final issue raised by Petitioners, namely, the assertion that the PUC based its conclusion of used and useful solely on its finding that no excess generating capacity was created by Limerick I, and that this was error. Petitioners point out that a great deal of the used and useful litigation to date has revolved around the question of whether excess generating capacity has been created. *See, e.g., Pennsylvania Power & Light*. Petitioners assert, however, that the PUC decision at issue stands for the proposition that if no excess generating capacity is found to exist, then a plant will, per se, be deemed to have met the used and useful standard. Thus, according to Petitioners, a utility could install Persian rugs in its offices or purchase a fleet of Cadillacs for its meter readers and still pass along the costs because such items could easily meet the used and useful definition. We disagree.

"[T]he term 'used and useful', as applied to a utility's return on its investment, is codified in Section 1310(d) of the Public Utility Code [66 Pa. C. S. §1310(d)], which provides that a utility is entitled to 'a

---

those cases, the Commission found that excess capacity existed and ordered an adjustment to rates. In the others, the Commission found, for various reasons, that the utilities did not have excess capacity. In no case, however, has the Commission found that excess capacity existed, yet failed to make an adjustment to rates. Further, in all of those cases, the Commission fully considered its prior decisions, and applied those precedents to the facts of the case.
OCA's brief at 41.

fair return upon the fair value of the property of such public service.' " *Pennsylvania Power & Light Co.,* 101 Pa. Commonwealth Ct. at 377, 516 A.2d at 430. It is established that "the 'touchstone for determining whether or not a prudently constructed unit should be included' in a utility's rate base is whether or not, during the last year involved, the unit will be used and useful in rendering service to the public.' " *Id.* at 376, 516 A.2d at 430, (quoting *Philadelphia Electric Co.,* 61 Pa. Commonwealth Ct. at 329, 433 A.2d at 623). Furthermore, our decisions make clear that if the PUC reasonably concludes that property is not used or useful in serving the public, then that property cost will not be passed on to ratepayers. *Philadelphia Electric Co.,* 61 Pa. Commonwealth Ct. at 329, 433 A.2d at 623. Thus, we trust that the PUC would not find Persian rugs or a fleet of Cadillacs to be used and useful to the public.

The PUC argues in its brief that the argument being advanced by Petitioners stems from the PUC's rejection of Petitioners' suggested used and useful analysis. Petitioners argued to the PUC, and now argue to this court, that a cost/benefit life cycle analysis of Limerick I should have been employed. The PUC specifically addressed and rejected Petitioners' suggested analysis:

> The OCA and UUC/UP have complained in their Exceptions that the Recommended Decision has ignored their Limerick life cycle analyses which purport to show that the unit will produce no positive benefit over its useful life (OCA Exceptions, p. 18, UUC/UP Exceptions, p. 9).

> We find, however, that such analyses are of limited value in light of our determination that the record evidence will not support a finding of excess capacity. A nuclear plant life cycle analysis must be based, in part, upon assumptions and speculative projections which can be the

subject of wide disagreement. We are inclined to agree with PECO that such studies are not directly relevant to our inquiry here, since we have already determined that the Limerick I capacity is needed (PECO Reply Exceptions, p. 31).

61 Pa. PUC at 615. As noted earlier, the PUC has wide discretion in making adjustments to rate bases. We cannot conclude that the PUC erred in employing the lack of excess generating capacity as a basis for its decision. We do not, of course, hold that the lack of excess generating capacity is, per se, sufficient to meet the used and useful standard.[15] We hold only that, in this case, the PUC did not err in finding the Limerick I plant to be used and useful.[16] Accordingly, we affirm the PUC's finding on that issue.

------

[15] Similarly, in the *Pennsylvania Power* & *Light* case we refused to hold that the *presence* of excess generating capacity resulted in an automatic exclusion from the used and useful definition:

We note that, in the proper case, it may be possible that a new generating plant is 'used and useful' despite the fact that its capacity is not immediately needed to insure that a utility has an adequate reserve capacity. The case at bar, however, is not such a case because, under any standard, the capacity PP&L possesses beyond that necessary for its reserve requirements is not used and useful.

101 Pa. Commonwealth Ct. at 379, 516 A.2d at 431.

[16] We note that the present decision is in accord with the PUC's earlier interpretation of the word "useful," which we accepted in the *Pennsylvania Power* & *Light Company* case:

In the instant case, the Commission has interpreted the word 'useful' as requiring that:

the plant and its associated capacity contribute no more than necessary to system *reliability* in the accepted, technical sense. In other words, the question is whether the Company's total capacity, including the plant in question, is commensurate with the requirements for peak

No. 2279 C.D. 1986

In this case, PECO appeals the PUC order affirming the ALJ's grant of the Commission Prosecutory Staff's (Trial Staff) motion in limine to strike PECO's evidence on the reasonableness of its decisions to delay construction on the Limerick plant.[17] The PUC reasoned that because it had issued a prior opinion and order which conclusively determined the issue of the reasonableness of the delays, PECO should not be given an opportunity to relitigate the issue. As the PUC stated in its June 27, 1986 opinion:

> [T]he issue in this proceeding is not the prudence or reasonableness of the Company's actions, but rather to determine if the decisions, made in 1976 and 1978 to delay completion of Limerick 1, resulted in an unreasonable escalation in the cost of that unit. If we find that unreasonable costs were incurred as a result of the construction delays, we then have the task of quantifying the impact of those imprudent management actions upon the Company's customers.

---

demand plus a reasonable reserve margin relative to the Company's own system and to its PJM obligation.
101 Pa. Commonwealth Ct. at 377, 516 A.2d at 430 (quoting Commission's Opinion at p. 17).

[17] The ALJ's ruling was issued on December 20, 1985 and stated: "[Trial] Staff's motion that we determine that the Commission's prior findings at I-80100341 [Re Limerick Nuclear Generating Station, 56 Pa. PUC 47 (1982)] that Philadelphia Electric Company's decisions in 1976 and 1978 to delay Limerick construction were unreasonable are conclusive upon the parties in this proceeding is hereby granted." Quoted in 61 Pa. PUC at 607. The PUC affirmed the ALJ's ruling, on interlocutory review, on January 21, 1986. The January 21, 1986 order is properly before us because it was interlocutory and, as such, did not become appealable until the PUC's final order of June 27, 1986.

61 Pa. PUC at 607. The PUC went on to find that unreasonable costs were incurred because of the delays and reduced PECO's requested rate increase accordingly. 61 Pa. PUC at 607-613.

PECO asserts that the PUC's refusal to allow PECO to present its evidence on the reasonableness of delay was erroneous because, PECO argues, the earlier decision did not, in fact, conclusively determine the issue. We are constrained to agree.

While we applaud the PUC's foresight in initiating an investigation prior to a request from PECO to include Limerick costs in its rate base,[18] we believe a recent decision of our Supreme Court governs our resolution of this issue. The PUC decision in *Re Limerick Nuclear Generating Station* was appealed to this court and then to the Supreme Court.[19] The focus of both our opinion and the Supreme Court opinion was the parameters of PUC authority with respect to its involvement in utility decision making. However, the Supreme Court did make reference to the reasonableness issue, stating as follows:

> Further, the opinion accompanying the PUC's order contained criticism, of an advisory nature, directed at PECO's decision in 1976 and 1978 to defer completion of the Limerick facilities. Such mere criticism, however, does not constitute an adjudication and cannot be reviewed on appeal.

*Pennsylvania Public Utility Commission v. Philadelphia Electric Co.,* 501 Pa. 153, 161 n.7, 460 A.2d 734, 739 n.7 (1983).

---

[18] *See* 56 Pa. PUC at 50.

[19] *Philadelphia Electric Co. v. Pennsylvania Public Utility Commission,* 71 Pa. Commonwealth Ct. 424, 455 A.2d 1244 (1983), *rev'd Pennsylvania Public Utility Commission v. Philadelphia Electric Co.,* 501 Pa. 153, 460 A.2d 734 (1983).

The parties have raised numerous issues, including the applicability of collateral estoppel, distinctions between adjudications and findings or conclusions, and the requirements of due process. As we have concluded that a remand is necessary, we will address these issues only insofar as necessary to support our conclusion.

The PUC relies heavily on an earlier PECO case, *Philadelphia Electric Co. v. Pennsylvania Public Utility Commission*, 61 Pa. Commonwealth Ct. 325, 433 A.2d 620 (1981), in support of its argument that collateral estoppel bars PECO's attempted relitigation of the reasonableness issue. We find the case inapposite. In the 1981 PECO case, a *prior rate case* had established the fact sought to be relitigated. 61 Pa. Commonwealth Ct. at 337, 433 A.2d at 624. In the present case, we do not have a prior rate proceeding before the PUC. The *Re Limerick* decision does contain discussion of PECO's delay decisions. However, our review of that decision persuades us that the discussion is, in fact, "mere criticism" and does not support the PUC's exclusion of PECO's evidence on the issue.

Our conclusion is based on a myriad of factors, including the fact that the order issued in *Re Limerick* does not even mention the delay decisions. 56 Pa. PUC at 70-71. The order focuses exclusively on issues relating to construction of Limerick II. Thus, as noted by the Supreme Court, there was no adjudication of the reasonableness issue. Inasmuch as the present proceeding led to an adjudication, it was error for the PUC to exclude PECO's evidence on reasonableness.

Accordingly, we remand this case to the PUC for a hearing and adjudication on the limited issue of the reasonableness of PECO's delay decisions.

ORDER IN 2248 C.D 1986 AND IN 2269 C.D. 1986

AND NOW, March 31, 1988, the Pennsylvania Public Utility Commission order of June 27, 1986, insofar as

appealed from in No. 2248 C.D. 1986 and No. 2269 C.D. 1986, is affirmed.

ORDER IN 2279 C.D. 1986

AND NOW, March 31, 1988, the above-captioned case is remanded for a hearing and adjudication on the issue of the reasonableness of Philadelphia Electric Company's delay decisions.

Jurisdiction relinquished.